IRONCLAD MFG. CO. v. DAIRYMEN'S MFG. CO..

SAME v. ORANGE COUNTY MILK ASS'N.

(Circuit Court, S. D. New York. May 26, 1905.)

PATENTS—INFRINGEMENT—MILK CANS.

The Haigh patent, No. 607,433, for a milk can, the essential features of which are in the construction of the neck portion, which is double, one part fitting over the other, one having a flaring re-enforcing flange, and the other an annular recess, forming together, when closed, a flush-joint interlocking means, while not strictly a pioneer patent, discloses patentable invention in a marked degree, and is entitled to a liberal range of equivalents; the can shown being stronger in the neck portion, and also more sanitary, than any in the prior art. Also *held* infringed.

This is a suit in equity to restrain the alleged infringement by defendants of United States letters patent No. 607,433, granted to the complainant July 19, 1898, as assignee of Henry B. Haigh, and also for an accounting. This patent relates to the construction of milk cans—more particularly the upper or neck portion. The application was filed by Haigh on the 22d day of October, 1897. The defendants say: "Two defenses are relied upon: First, that the patent in suit is invalid for want of patentable invention; and, second, that defendants' milk can does not infringe."

Kenneson, Crain, Emley & Rubino (George E. Morse and Frank S. Black, of counsel), for complainant.

William Wallace White and Sweezy & Glover (Duncan & Duncan, Henry D. Williams, Frederick S. Duncan, and Richard L. Sweezy, of counsel), for defendants.

RAY, District Judge. The defendant insists that in view of the prior art the complainant's patent, known as the Haigh patent, No. 607,433, of July 19, 1898, for improvement in milk cans, does not disclose patentable invention, and that, if any one or more of the claims of that patent can be sustained, it or they are narrow claims, on specific and defined combinations, and that, as defendant's can contains none of these combinations, so construed, it does not infringe. The defendant has put in evidence and cites several United States patents as showing the prior art and sustaining his contention, among which are the following: Milligan, No. 107,521, of 1870; Milligan reissue, No. 5,850, of 1874; Tripp, No. 489,644, of 1893; Tiepke, No. 374,380, of 1887; Burnett, No. 231,531, of 1880; Sangster, No. 100,454, of 1870; Wolf, No. 516,255, of 1894. These all relate to milk cans, and will be referred to later. The complainant, on the other hand, insists that the Haigh patent in question is a pioneer patent, and entitled to a broad and most liberal construction. The complainant says:

"It [the invention] solved a vexatious commercial problem, created a revolution in the industry, and seized and holds the trade. * * * Complainant rests its case upon the proposition that its patent is fundamental and basic."

It is well known to those who use milk cans either for the transportation of milk upon wagons or railroad trains that there are two essentials in a successful can: First, special strength about the neck portion; and, second, perfect sanitation—that is, such a construction that the joints on the inside of the can will not take and retain the milk, or interfere with a perfect cleansing after the milk has been removed. Milk is a great absorbent of impurities, and will take them from the atmosphere. It rapidly sours when exposed to the warm air or to heat, and will become unfit for human consumption if put in a clean can, tightly closed, when first taken from the cow. Even a few drops of sour milk retained in the inside seams or joints of a can, if there be any, will rapidly sour or contaminate the pure milk put therein, whether it be a few gallons, or enough to fill the can. Flush joints, so constructed as to be impervious to the milk (that is, so constructed that milk cannot get into them), are essential to a proper milk can. It may be that as yet a "proper" milk can has not been made, but it is evident that the alleged inventor of complainant's can was aiming to produce one. So as to strength. Owing to the mode of handling these cans in transportation, both when filled and when empty, great strain comes upon the can, especially about the neck portion, and the seams are liable to spring or open so as to take in more or less of the contents of the can, and so as to defy perfect cleansing. The result is an unsanitary condition of the can, and the consequent rapid contamination of the entire contents. Hence the necessity for a strong-necked

can, so far as possible free of seams; the necessity of having the seams, if any, flush-joint seams, entirely closed, and at such a point as to be easily reached and perfectly cleansed. "Strength" and "perfect sanitation" were the aims of Haigh, the inventor. What was in the mind of the inventor is best shown by the claims of the patent and extracts from the specifications. The claims are as follows:

"(1) A milk can comprising a breast member provided with a neck portion, and a mouth member provided with a neck portion, one of said neck portions extending within and being overlapped by the other neck portion, and one of said neck portions having a flaring re-enforcing and locking flange, and one of said members having an annular recess for the reception of said flaring flange, whereby the breast member and mouth member are locked together by a flush-joint interlocking means.

"(2) The herein described milk receptacle, comprising a mouth member provided with a depending neck portion, and an annular recess above said neck portion, and a breast member having an upwardly extending neck portion extending within and overlapped by said mouth neck portion, and having a flaring locking and re-enforcing flange seated in the recess of the mouth member, and forming therewith a flush joint, whereby the mouth neck portion and the breast neck portion are each re-enforced one by the other throughout the entire area thereof, and whereby the point of juncture of said neck portion is located outside of the interior of the can.

"(3) A milk can comprising a breast member provided with an integral neck portion, and a mouth member provided with an integral neck portion, one of said neck portions extending within and being overlapped by the other neck portion to form an annular space intermediate said integral neck portions, and one of said neck portions having a flaring re-enforcing and locking flange, and one of said members having an annular recess for the reception of said flaring flange, whereby the breast member and mouth member are locked together by a flush-joint interlocking means, and whereby such interlocking means forms a closure for completely closing said annular space.

"(4) A milk can comprising a mouth member provided with an integral neck portion, a breast member also provided with an integral neck portion, said integral neck portions so overlapping each other and connected together as to form a closed, protected annular space intermediate such integral neck portions, and a re-enforcing band inclosed in said space, intermediate said neck portions, and forming a treble re-enforced neck.

"(5) The herein described milk can, comprising a mouth member provided with a depending neck portion, and an annular recess above said neck portion; a breast member provided with an upwardly extending neck portion, extending through and overlapped by the mouth neck portion throughout the entire area thereof, and having an outwardly extending flaring locking and re-enforcing flange seated within the annular recess of the mouth member, and forming therewith a flush joint above the neck of the can, said flaring flange constituting re-enforcing means for the mouth member adjacent to the neck angle thereof and an annular metal band intermediate the neck portions of said breast and mouth members, and of the same area as each of the said neck portions, substantially as described."

In the specifications it is said, among other things:

"This invention relates to milk cans, and more particularly relates to the construction of the upper or neck portion of the can, and has for its object to provide an improved can, having the neck portion thereof re-enforced in a peculiar and effective manner, and in such a way as to permit the neck of the can to be made of two parts, each one interlocking with the other and each re-enforcing the other, whereby the mouth portion and the breast portion of the can can be constructed independently of each other, and therefore with greater facility than when made in one piece, and, when placed in position relatively to each other, will form a neck of superior durability, each part of which overlaps the other part thereof throughout its entire area.

* * * Heretofore milk cans have been constructed in various ways, one of which has been to make the mouth, neck, and breast of the can in one integral piece or structure, which, aside from the difficulty in obtaining such a structure, has resulted simply in the production of a can which is extremely weak at the neck portion thereof, where it should be of great strength and rigidity, as the neck, being formed in one piece with the mouth and breast, is of the same thickness as such breast and mouth, and therefore, not being re-enforced, it follows that when the cans are subjected to rough usage and handling, by catching the same under the flaring mouth, as is usually the case, especially when empty, such cans soon become bent at the neck portion thereof, and by reason of such flexure the proper fitting of the cover is prevented, and the usefulness of the can thereby impaired. It is the purpose of this invention to permit the ready and easy construction of the upper portion of the milk can, while at the same time so re-enforcing the neck portion thereof that the rough handling or usage of the same will not affect or impair the usefulness of the can. In a general way, the upper portion of this can or receptacle comprises a mouth member having a neck portion, and a breast member also having a neck portion, preferably of the same area as the neck portion of the mouth, the neck portion of one member fitting within and being preferably completely overlapped by the neck portion of the other member, and the neck portion of one member interlocking with the neck portion of the other member, so that, as compared with the mouth and breast portions of the can, the neck thereof is of greater thickness and rigidity. In the preferred form thereof herein shown and described, the flaring mouth member, 2, of the can, A, is provided with a depending neck portion, 3, and immediately above such neck portion with an interior annular recess, 4. Figs. 1 and 4. The breast member, 5, of the can is drawn inwardly to form an upwardly extending neck portion, 6, and shown in one construction of less diameter than the neck portion, 3, so that it can be inserted in and overlapped by said neck portion, 3. Each neck portion extends at an angle to its respective breast or mouth member, thereby rendering such neck part rigid. Before the neck parts are completely assembled, the neck portion, 6, of the breast member is in this construction of greater width or area than the mouth neck portion, 3, whereby the upper part thereof is adapted to overlap a portion of the mouth proper above the angle thereof, and form locking means for the two neck portions and the breast and mouth members, and also re-enforcing means for the mouth at the angle thereof. When the parts are assembled (Fig. 1) the neck portion of the breast extends upwardly through the neck part, 5, and projects above the same, such projecting part being bent or turned outwardly at a relatively sharp angle to form a locking flange, 7, which rests in the annular recess, 4, and so locks the neck portions and the breast and mouth members together; the upper edge, 7', of said flange being flush with the inside face of the mouth. The lower edge of the mouth neck portion, 3, rests on the breast member, and may project slightly below the point of juncture of the breast neck portion, 6, with the breast, thus protecting such juncture point. By this construction when the parts are assembled it will be seen that one neck portion is substantially of the same area or width as the other neck portion, so that one completely overlaps and re-enforces the other throughout the entire area thereof. From the above it will be seen that the locking flange, 7, also serves as a re-enforcing means for the mouth member at the point of juncture therewith of its neck portion, 3, and consequently at the mouth angle, while at the same time it will be seen that the actual joint or point of connection, 8, of the breast neck portion with the mouth neck portion is at a point remote from the angle of the neck, and in a location outside of the interior of the can, so that the joint is perfectly observable, and is accessible for cleaning, without requiring special care on the part of the operator. From the foregoing it will be seen that an improved can is provided, having a neck of extreme strength and rigidity, and heavily re-enforced at the point of greatest strain, each neck portion forming such neck being of the same width or area, and that the neck is so constructed as to avoid the making of any seam within the can which would be unobservable or inaccessible, thereby avoiding any increased liability (over the ordinary cans heretofore in use) of retaining

dirt or germs, and thereby impairing the sanitary value of the can. * * * When the parts have been assembled and firmly locked together, they are subjected to the usual coating or tinning operation, whereby the seams are filled and the joints firmly cemented together by the coating metal, which acts as a soldering medium. In the construction of can shown in Figs. 3 and 5, when this tinning operation has been completed the band will be securely closed in and protected in its closed and protected space from oxidation by water or by the acids which are formed from any of the metallic or other fluids that may be left on the can. From the foregoing it will be seen that the mouth and breast portions of the can can be formed of separate members, thereby facilitating the construction of the upper portion of the can, while at the same time the weak point, and the one which is usually subjected to the greatest injury and the roughest usage, is thoroughly reenforced and protected, and that owing to the flush joints the retention of dirt or germs is obviated, and the sanitary value of the can is not impaired, and that, furthermore, by the construction of cans shown in Figs. 1, 3, 4, and 5, the locking joint is observable, so that any dirt or foreign matter forming at such point can be readily observed during the cleansing operation, so that by the present improvement a can is secured, which, from a sanitary point of view, is equal to a can made without joints, while at the same time is of greater durability and rigidity and more easily constructed than such a jointless can."

The necessity and utility of making the necks of cans strong had long been recognized. In a patent to one William Frost (Reissued No. 26,098, November 15, 1898) for a milk can, we find this statement:

"The object of this invention is to render milk cans far more durable than hitherto, so that they will be competent to withstand in a very great degree the wear and tear consequent to transportation. Milk is conveyed to cities in these cans, and mostly on railroads, and they are stowed or packed closely together in cars, and soon are rendered useless by abrasion and the bruises they receive by rough handling."

Many other patents recognize the same difficulties—notably one to Fliehr, No. 391,039, of October 16, 1888. In this we find the following:

"It is well known among persons engaged in the handling of milk cans that, owing to the rough usage they necessarily receive and numerous other causes, the neck portion of the can, and particularly the mouth, is the first to render the can unfit for use."

It is evident that Haigh was not the first to recognize and attempt to remedy this condition in milk-can construction, for in all or nearly all of the patents hereinbefore mentioned we find an attempt to make a double-necked can, in whole or in part. Milk cans are constructed with a flaring mouth, rapidly narrowing to the neck, which neck is a few inches in length. At the lower end of the neck the can broadens into the shoulder or breast part, which is curved or dome-shaped, and this in turn runs or merges into the body part of the can, the sides of which are perpendicular. The neck proper is perpendicular. The upper part of the can, including mouth and neck portion, is known in the patent as the "mouth member," while the next part below is known therein as the "breast member." Each has a neck portion or extension. It will be noted that the neck part of the mouth member extends downwardly, while the neck part of the breast member extends upwardly, and the one being of a slightly diminished diameter—it may not be material which—will slip within the other; and, if each neck part is of the same length, the one

will extend upwardly to the outward swell of the mouth part, and the other downwardly to the outward swell or dome of the breast portion. So far we have two cylindrical neck pieces or parts, slipping the one within the other, similar to the sections of a stove pipe. This construction, thus far, as applied to milk cans, is not new, for we find it on the Milligan, Tripp, and Tiepke patents, before mentioned, and to a degree in the Wolf patent. It will also be observed, as bearing on the sanitary question, that, if the neck part of the breast member or portion extends upwardly inside the neck part of the mouth member, the seam or joint in the inside of the can will be at the bottom or lower part of the mouth, and at the top of the upper end of the neck, where it can be easily seen and reached, and kept in a strictly sanitary condition. If, however, the reverse construction is adopted, and the inside seam or joint comes at the bottom or lower extremity of the neck, it is still in sight, and easily reached and cleansed. Under the Haigh patent in suit, either construction is permissible. The Haigh patent does not stop at the double-neck feature. It proceeds to designate and specify as one of its elements "a flaring re-enforcing and locking flange," which belongs to and forms a part of "one of said neck portions," and also, as another element, "an annular recess for the reception of said flaring flange," which recess belongs to "one of said members"; that is, either to the "mouth member" or the "breast member." It is not material whether this "annular recess" and "flaring flange," when the parts are assembled, are at the lower or at the upper portion or end of the neck proper, except as bearing on the ease of seeing and observing the joint formed thereby, and keeping same clean and free from anything that might contaminate the milk. It is important here, as bearing on the patentability of the device, as well as on the question of infringement, to determine what is meant in the patent by the words or expressions "annular recess," and "flaring re-enforcing and locking flange," and "locked together," and "flush-joint interlocking means." These are elements of the patent in suit, and, if it so be that the alleged infringing can does not contain or use these elements, there is no infringement. So, too, if all there is to the patent or claims of the patent is (1) a milk can having (2) a breast member provided (3) with a neck portion, and having (4) a mouth member provided (5) with a neck portion, and (6) so constructed or assembled or put together that one of said "neck portions" extends within the other "neck portion," there is, in view of the prior art, neither patentable invention disclosed, nor infringement shown. And even if there be patentable invention in such case, there is no infringement.

Claim 1 of the patent as originally filed was this:

"I claim as my invention (1) a milk can comprising a breast member having a neck portion, and a mouth member having a neck portion, one of said neck portions extending within and being overlapped by the other neck portion throughout its entire area."

This was rejected by the Patent Office on the Tiepke patent of December 6, 1887, No. 374,380, and was abandoned.

Claim 2 of the patent as originally filed, now claim 1 as allowed,

and hereinbefore given in full, read the same as now, with the exception that as filed it provided that, where one of the neck portions extended within the other, it was "overlapped" by the other "throughout its entire area." These last words were voluntarily stricken out by the applicant. It will be noted that all of claim 2 as filed, claim 1 as allowed, down to the provision for the flange, recess, and locking together "by a flush-joint interlocking means," is merely claim 1 as rejected and abandoned. What made this claim (now 1) patentable were these latter provisions for "flange," "recess," and "flush-joint interlocking means." These elements evidently were regarded as new by the Patent Office. Clearly so in the combination.

For these reasons, we are not to give a narrow, or restricted, but a broad, construction to the language of claim 1 of the patent in suit, so far, at least, as it relates to these elements. It is well to mention here that claim 3 of the patent as filed (claim 2 as allowed) was not changed, except by the voluntary striking therefrom of the words "throughout its entire area" in the same connection before mentioned with reference to striking those words from (now) claim 1.

"Flaring" means opening or spreading outwards. "Re-enforcing" means adding to or aiding or strengthening. "Flange" is an internal or external rib or rim for strength, or it may be for other purposes. At the end of a pipe or bar of iron it may be a ring or a plate on one side, both sides, or, if in the round bar of iron, on the entire circumference. A "recess" is a space formed by the receding of the wall. Here it would be a receding of the side of the can. It would be a circular receding of either the side of the neck of the can or the side of the breast portion of the can. "Interlocking" means united with, to embrace, to connect with, to flow into, to be connected in one system, to interlace firmly. It does not mean necessarily that these parts of the can are to be interlocked in the sense that a door is locked. Indeed, on a careful examination of the patent and all its claims, and a careful reading of the specifications, I am satisfied that it was not intended, in using the words "locking" and "locked," to indicate or suggest that the parts are to be locked together so as to prevent the one from being pulled away from or out of the other. These words were used in the broader sense already indicated. It is evident, however, that in the construction either the neck portion or the breast portion is to have a flange or its equivalent, and that one of the members is to have a recess or its equivalent, so as to form, when the parts are assembled, put together, and spun, a flush-joint interlocking means. The purpose of this flush-joint interlocking means formed by the flaring flange and the annular recess for the reception thereof is not to prevent the breast member from being pulled away or separated from the mouth member, but to secure in the structure a tightly closed flush joint on the inside of the mouth of the can, somewhere at the foot of the mouth member or top of the neck, or not lower down than the foot of the neck of the can. Another purpose is to secure a

188 F.—9

double-necked can so arranged and put together as to add strength and durability and rigidity to the neck of the can, and also in a degree to the mouth part and breast part of the can, for here is where the greatest strain comes. These purposes are gathered clearly from the specifications of the patent already quoted. A careful examination and reading of the claims and specifications in the patents forming a part of the prior art fails to show anticipation or want of patentability in the complainant's can, in view of such prior art.

The court fails to find in the prior art means for securing proper sanitation; that is, such a construction on the interior of the can as to bring the seams and joints into view, and so interlocked and closed as to form a flush seam or surface, so that perfect cleanliness may be obtained. In the Frost can of 1859, tinned iron hoops were provided, having their ends connected together by rivets, and these were soldered on to the can. The object was to strengthen the can. In the Preston patent of 1863 the improvement related to the banding of milk cans for the purpose of strengthening them. In this construction the parts were riveted together, and rivet heads were found on the inside of the can. The inventor said:

"In order to prevent any accumulation of dirt or grease around the rivet heads, especially in the inside of the can, we covered them with solder, so as to produce a smooth and nearly even surface thereat."

It does not seem necessary to give here the salient features of each patent in the prior art. Suffice it to say the court has examined them all. In the Shepherd milk can (United States patent of May 28, 1889, No. 404,117) the purposes of the improvement were substantially the same as declared by Haigh in his specifications. Shepherd says:

"The object of this invention is not only to protect and strengthen the cans, but also to protect them at the seams, and to prevent the lodgment of any milk between the seams and the outer bands which I employ for re-enforcing the seams."

He then graphically describes the rough usage, wear and tear, to which milk cans are exposed, and then continues:

"Many ineffectual efforts have been made to render them able to withstand this rough usage for any considerable time. One of the greatest difficulties that this frequent banging about causes is the breaking open of their seams, and when this occurs the milk will be more or less 'swashed' all over the can, and it will then get into even the minutest crevice in the broken seam or seams. The great damage resulting from this is, however, not confined merely to the expense and delay of repairing or replacing the can, nor to the mere loss of the milk which thus escapes, though this is serious enough; yet it is slight compared to the consequent continuing damage to the milk which may afterward be put into the same can, and which damage is caused as follows, viz.: When the milk once enters the crevices of a broken seam, it cannot be all got out, not even by careful and constant washing, or by any known means, for it insinuates itself into the minutest part of the fracture, and more or less of it will remain, defying any effort to remove it, and wherever it remains it not only, like all decaying animal matter, will emit a most offensive and intolerable odor, but it will also seriously affect and damage all milk afterward placed in such can."

He then further describes the bad effects, and shows the necessity of a remedy. Two remedies—one for adding strength to the can,

and the other for sanitary purposes—are suggested by his patent. He then says:

"It is this existing state of facts that has led to my present invention, the object of which is to furnish a milk can for railway and other transportation with seams so protected that, even with the rough usage that cans are subject to, the seams cannot be broken, and consequently no milk can find its way and lodge where it cannot be got at, and they may be thoroughly cleansed every day, and with no fear of the evil effects above mentioned."

Other patents prior to the Haigh patent speak of these defects in cans, the bad results, the necessity for a remedy, etc. Other inventors labored in this field, seeking to accomplish the results Haigh was aiming at. Hence this court cannot find that Haigh was strictly a "pioneer." See Ford v. Bancroft, 98 Fed. 309, 312, 39 C. C. A. 91, 95:

"Where a patent represents a marked advance in the art (for example, where an inventor for the first time accomplishes a certain result by organizing several groups of instrumentalities into a single automatic machine, as in the Morley patent for sewing shank buttons to a fabric, or in the Reece patent for a buttonhole sewing machine), such a patent is called a 'pioneer'; and the courts, in its construction, have adopted a liberal rule with respect to equivalents."

In Westinghouse v. Boyden Power Brake Co., 170 U. S. 561, 562, 18 Sup. Ct. 707, 718, 42 L. Ed. 1136, the court said:

"To what liberality of construction these claims are entitled depends to a certain extent upon the character of the invention, and whether it is what is termed in ordinary parlance a 'pioneer.' This word, although used somewhat loosely, is commonly understood to denote a patent covering a function never before performed, a wholly novel device, or one of such novelty and importance as to mark a distinct step in the progress of the art, as distinguished from a mere improvement or perfection of what had gone before."

But this court is of the opinion that the Haigh patent discloses patentable invention in a marked degree, and that he made a marked advance in the art.

The reissued Milligan patent of April 28, 1874, No. 5,850, for "improvement in milk cans," had for its object "to provide the strongest can with the least amount of metal, and the simplest construction." He had a single claim for a combination "to form a double-sided and double-bottomed can." The object of the Burnett patent, No. 231,-531, of August 24, 1880, was to strengthen the bottom of the can, and also the body where it joins the breast. He says:

"The lower end is fortified by the presence of the bottom, as also, usually, by additional hooping; but the upper end, where the body joins to the breast, although it may be fortified by one or more hoops, is still peculiarly liable to blows which temporarily or permanently change its shape. * * * The neck and mouthpiece or bowl are not much liable to injury. I form the neck double. I by that means secure an unusually strong and perfect hold on the bowl and breast."

Burnett did not even recognize the main difficulty Haigh sought to remedy, viz., the weakness of the neck itself, the great strain upon it, etc. His mode of making the neck double is not like that of Haigh. The Tiepke patent of December 6, 1887, No. 374,380, re-

lates not at all to sanitation, but to the making of a strong double neck. He says:

"My said invention relates to cans for transporting milk and other commodities, having the usual cylinder and bottom, but provided with a double neck and breast to give those parts greater strength and durability."

This was the idea and purpose of claim 1 of the Haigh patent when first filed, and which claim was rejected and abandoned. This left all the claims of the patent in suit for a strong-necked, sanitary can, with a new and a peculiar construction, and of it the witness Henry C. Milligan says:

"In these large cans, the important feature that the buyer of these cans has in mind, to start with, is the greatest strength where the greatest strength is required, and where the neck members are so joined that a flush, sanitary union is obtained. As I have defined and as is defined by all the trade—the trade's construction of 'sanitary,' in this sense—I state, in my opinion, there never was such a can produced until the invention of H. B. Haigh was put into practical use and manufactured on a commercial scale. * * * In looking at this Haigh can, its construction—easy and practical and commercial way in which it is constructed—I state, from my knowledge of the art, that it is absolutely new in the features, all of which I have rendered an opinion on."

The Wolf can, of March 13, 1894, No. 516,255, in claim 1, speaks of a ring circumscribing the lower edge of the body of the can, while claim 3 relates to the construction of the bottom of the can, and claim 4 relates to the connection between the main body of the can and the breast portion and the flaring neck, and a cover having an annular channel in its under face to receive the edge of the cylinder. Claim 2 of that patent is as follows:

"In a milk can, a ring composed of two flanges and a shoulder, one flange, h, circumscribing the lower edge of the breast, b, the other flange, i, circumscribing the upper edge of the cylinder, a (this being the main body of the can), attached thereto, substantially as and for the purposes set forth."

In the specifications the patentee says:

"The ordinary cans are also weak in the neck, as they are constructed with a dished rim soldered to the upper edge of a cylinder, the lower edge of which is soldered to the breast of the can. I form the dished rim, j, and a portion of the neck, k, of one piece, and also the breast, b, and the lower portion of the neck, k', of one piece, lapping the portions, k and k', and forming only one annular soldered or riveted joint, l, at the strongest part of the neck, or near the middle thereof."

He says nothing of sanitation.

The conclusion is inevitable, giving a fair construction to the complainant's patent, that it discloses patentable invention, as before stated, of a marked degree and character. The proof shows that it met with great favor with the dealers in and users of milk cans. In short, it met with great commercial success. It was stronger, better, more durable, and much more sanitary than any can upon the market or known to the trade. Many of its features were old, but the combination is new, and some of the elements of the combination are entirely new. The combination of elements has produced in a sense a new result. The result obtained is a very much improved mode of constructing a milk can. A much stronger

and better can is produced at a lessened cost of production, and the sanitation is far better than that found in any can of the prior art. The Patent Office saw patentable invention in the device and construction of Mr. Haigh. The patent is presumptively valid, and this presumption has not been overcome. The defense of want of patentable invention fails.

We come now to the question of infringement. Here the evidence, in one view of the case, is somewhat involved, and quite conflicting. In the first place, the defendants deny that their construction, conceding it to be as the complainant claims, is an infringement of the Haigh patent. In the next place, the defendants contend that the only cans constructed by them that could by any possibility be held an infringement were accidental cans, and that they ceased their manufacture as soon as it was discovered that these so-called accidental cans even imitated the construction of the complainant's can. The alleged infringing can has been during the trial, and will be, referred to as the "John Street Can." No one will assert that the defendants are not at liberty to make and use a can of the Milligan or Tiepke construction. But it is contended that defendants have done much more than this. The John Street can, the alleged infringing can, has (1) a breast member provided with a neck portion; (2) a mouth member provided with a neck portion; (3) one of said neck portions extending within, and being overlapped by, the other neck portion; (4) one of said neck portions having a flaring re-enforcing and (in the broad sense) locking flange; and one of said members (the other) having an annular recess, which receives the lower edge or end of the neck part of the mouth member, but in the John Street can this edge is not bent over so as to fit or go into the recess. Such bending over is unnecessary, for the locking is complete, in the broad sense, and a flush joint on the interior of the mouth of the can and at the bottom or lower extremity of the neck is secured without such bending over; and we have the breast member and the mouth member locked together in this construction by a flush-joint interlocking means. On the outside of the can, the neck portion of the breast member, extending upward in a straight line until it reaches the angle of the mouth member (that is, the point where the curve of the bowl terminates), bends outward at that end, forming a flange, which, coming at and in the recess made by the angle of the bowl and neck, the two (the angle forming a recess, and the bent end or edge of the neck of the breast member forming a flange therein) make such a structure that we have the two members locked together at this point indicated above. But here we do not have, nor do we require, a flush joint, for we are on the outside of the can. However, by beveling the lower edge or end of this neck member or flange we may easily have a flush joint. This construction gives a re-enforcing and locking flange at one point, and a flaring re-enforcing and locking flange at the other. The construction differs somewhat from that of the Haigh patent, but it is contended that this is in form, merely, and that it appropriates the principle of the Haigh patent, and that, in so far as they differ, the one is the well-known equivalent of the other. In fact,

it is asserted that the John Street can is almost a reproduction of one form of construction shown by the Haigh patent. This court is of the opinion that the defendants cannot escape the charge of infringement on the ground of slight and really immaterial changes in construction, so long as every element of the Haigh patent is appropriated and used to produce the same result in the same way, although the elements are combined in a somewhat different manner. See Walker on Patents (4th Ed.) § 350, where it is said:

"Sec. 350. No substitution of an equivalent for any ingredient of a combination covered by any claim of a patent can avert a charge of infringement of that claim. But like substitution of something which is not an equivalent will have that effect. The doctrine of equivalents may be invoked by any patentee, whether he claimed equivalents in his claim, or described any in his specification, or omitted to do either or both of those things. The patentee, having described his invention and shown its principles, and claimed it in that form which most perfectly embodies it, is, in contemplation of law, deemed to claim every form in which his invention may be copied, unless he manifests an intention to disclaim some of these forms. Combination patents would generally be valueless in the absence of a right to equivalents, for few combinations now exist, or can hereafter be made, which do not contain at least one element, an efficient substitute for which could readily be suggested by any person skilled in the particular art. But where a patentee states in his specification that a particular part of his invention is to be constructed of a particular material, and states or implies that he does not contemplate any other material as being suitable for the purpose, it is not certain that any other material will be treated by a court as an equivalent of the one recommended in the patent, though celluloid has been held an equivalent of metal in one well-considered case which depended upon the point."

As to combination claims, see Walker on Patents (4th Ed.) § 349, where it is said:

"Sec. 349. Omission of one ingredient of a combination covered by any claim of a patent averts any charge of infringement based on that claim. A combination is an entirety. If one of its elements is omitted, the thing claimed disappears. Every part of the combination claimed is conclusively presumed to be material to the combination, and no evidence to the contrary is admissible in any case of alleged infringement. The patentee makes all the parts of a combination material when he claims them in combination, and not separately."

As to the presence or absence in the John Street can of the elements of the Haigh patent the experts differ, and the court is left to examine the structures and claims and specifications and drawings, and, aided by these opinions of the experts, make a decision. Having caused the cans of the Haigh patent and alleged infringing cans of the John Street can type and construction to be brought into court and sawed into sections, this court is possessed of a decided opinion on the subject, derived from inspection and observation, but has not felt at liberty to be guided by that opinion thus formed, unless confirmed by the testimony of the witnesses. This reading of the evidence (a matter of time and patience) shows wide differences of opinion among honest experts—men experienced in milk-can construction and the wants and requirements of the trade. Henry C. Milligan says:

"Claim 3, claim 1, claims 4, 5, together with the specifications and the drawings, clearly show that the exhibit marked 'John Street Can' has the salient points and all the equivalents embodied in the invention of H. B. Haigh."

He also says, in reference to the Haigh patent:

"I have carefully examined the patent in question, and I find that it possesses features which are peculiar to itself—different, from features which I will explain, from any can heretofore made—so that, in my opinion, with the knowledge of the art dating back to its incipiency, this can, as constructed, I believe to be the pioneer can. It possesses the feature of having a double neck, joined by a seam sanitary in every respect."

He then says:

"I state unequivocally that I see no difference between the exhibit marked 'John Street Can' and what is known as the 'Haigh Can.' The salient features of the Haigh can, which, in my opinion, were new at the time the patent was issued; the features which I call attention to (that of a double neck joined by a sanitary seam)—those features are absolutely the same in the exhibit referred to."

Without quoting from other witnesses or calling specific attention to defendants' expert evidence, it is sufficient to say that one, at least, says the elements of the Haigh patent which differentiate it from the Milligan can and others are absolutely wanting in the John Street can. In substance and effect, this court agrees with the conclusion of complainant's expert, and finds that defendants' infringe. While this is a structure, and not a machine, I think the doctrine of Morley Machine Co. v. Lancaster, 129 U. S. 263, 273, 275, 9 Sup. Ct. 299, 32 L. Ed. 715, applies. The John Street can, however, has no improvement on the Haigh patent. See, also, McSherry Mfg. Co. v. Dowagiac Mfg. Co., 101 Fed. 716, 41 C. C. A. 627; Reece B. H. Mfg. Co. v. G. B. H. Mfg. Co., 61 Fed. 958, 10 C. C. A. 194; Western Electric Co. v. Home Tel. Co. (C. C.) 85 Fed. 649.

The complainant is not confined to the exact construction shown in the drawings. I find no words so limiting the patent. Much evidence was taken in open court—a very satisfactory manner of taking testimony in patent cases—on the question of the character and extent of the infringement, if infringement there has been. The defendants claim, as stated, that, by reason of the peculiar construction of the machinery used by them in manufacturing cans, the spinning wheel would occasionally overrun the point where it should have stopped, and where it was intended to have it stop, and form an outside recess in the neck part of the breast member, just below the lower end or edge of the neck part or portion of the mouth member; thus making the alleged flush interlocking and re-enforcing joint and connection on the inside so closely resembling that of the Haigh patent. This claim has not failed of serious consideration, but the court is satisfied that too many cans of that construction—John Street cans—were in use for that contention to prevail. If it be true that the defendants have only constructed and used or vended cans not having the objectionable features since the discovery of the alleged peculiar action of the spinning machine, and have wholly discontinued the manufacture thereof, an injunction will do no harm, and an accounting will disclose but little damage.

The complainant is entitled to an injunction and an accounting.