McSHERRY MFG. CO. et al. v. DOWAGIAC MFG. CO.*

(Circuit Court of Appeals, Sixth Circuit. February 20, 1908.)

Nos. 1,667, 1,751.

1. PATENTS—SUIT FOR INFRINGEMENT—PROFITS RECOVERABLE.

If a patent covers only a particular feature of an article sold by an infringer, the burden rests on him to show that the profits realized by him from the sale were not solely attributable to such feature; and a finding of a special master that they were so attributable, approved by the trial court, will not be disturbed on appeal unless there is clear evidence of mistake or error.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 38, Patents, § 545.]

2. SAME—DAMAGES—SUFFICIENCY OF PROOF.

To entitle the owner of a patent to recover from an infringer as damages the profit he would have made on the same number of machines or articles, he must prove that he could have supplied such machines and that but for the infringer he would have made the sales that were made by the latter. Upon the latter proposition the proof necessarily cannot reach certainty, but there must be evidence tending to establish it and sufficient to furnish data from which the number of his sales may be calculated with reasonable certainty.

3. SAME.

Complainant was the owner of, and sole manufacturer under, a patent for a grain drill which defendant was adjudged to have infringed. On an accounting under the decree it was shown that defendant sold a certain number of infringing drills, some outside of the territory where complainant's drill was on sale, and a certain number within such territory. Within such territory a large number of other drills were on sale and many of them, as well as defendant's, were sold at a lower price than complainant's. Held that, as to the territory where complainant's drills were not on sale, it could not be inferred that the purchasers of defendant's drill had any knowledge of complainant's or would have bought it if they had not bought defendant's, nor could the inference be drawn from the fact alone of defendant's sales within complainant's territory that the purchasers, or any certain number of them, would have bought complainant's drill if they had not bought defendant's; that such evidence, even when reinforced by the testimony of complainant's sales manager and certain of its general agents to the effect that its sales decreased in places where defendant's drill was sold in competition, and in consequence of such competition, did not afford data from which the amount of complainant's damages could be computed so as to entitle it to recover more than nominal damages.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 38, Patents, § 579.]

4. SAME—TREBLE DAMAGES—CONSTRUCTION OF STATUTE.

The provision of Rev. St. § 4921 [U. S. Comp. St. 1901, p. 3395], authorizing a court of equity to increase the damages found in favor of complainant in a suit for infringement of a patent, has no application to profits recoverable in such suit.

5. SAME—SUIT AGAINST CORPORATION—LIABILITY OF OFFICERS.

Where officers of a corporation are joined with it as defendants in a suit for infringement of a patent, the complainant is not entitled to a decree against such officers for profits realized by the corporation alone from the infringement.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 38, Patents, § 459.]

6. JUDGMENT—EQUITABLE RELIEF—PENDENCY OF APPEAL.

On a bill by a defendant to enjoin the enforcement of a decree against him on the ground of fraud, filed pending an appeal from such decree, the court is without jurisdiction to set aside such decree for error.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 30, Judgment, § 771.]

Richards, Circuit Judge, dissenting.

*For opinion on rehearing, see

Appeal and Cross-Appeal from the Circuit Court of the United States for the Southern District of Ohio.

E. E. Wood and Joseph Wilby, for appellant McSherry Mfg. Co.

B. F. Harwitz, for appellant C. B. Oglesby.

F. L. Chappell, for appellee.

Before LURTON and RICHARDS, Circuit Judges, and COCHRAN, District Judge.

COCHRAN, District Judge. This case is here for the second time. The opinion delivered on the former occasion is reported in 101 Fed. 716, 41 C. C. A. 627. We then held, partly in affirmance, and partly in reversal of the action of the lower court, that the appellant company had infringed the first five claims of patent No. 446,230 for an improvement in shoe grain drills issued February 10, 1891, to W. F. Hoyt, and by him assigned to the appellee, and that appellee was entitled to an injunction and an accounting. Questions relating to this patent have also been passed on by this court in the case of Dowagiac Manufacturing Company v. Brennan & Co., 127 Fed. 143, 62 C. C. A. 257, and by the Circuit Court of Appeals for the Eighth Circuit in the cases of Dowagiac Mfg. Co. v. Minnesota Moline Plow Co., 118 Fed. 136, 55 C. C. A. 86, and Dowagiac Mfg. Co. v. Fowler et al., 121 Fed. 988, 58 C. C. A. 643. On the return hereof to the lower court a decree was entered pursuant to the mandate, and a reference had to a special master to take and state the account. The suit was brought in March, 1897, and the infringement complained of extended from 1893 to June, 1900, the time of the entry of said decree. The special master found that the appellant company had made and sold during said infringing period 3,496 shoe grain drills of the kind held to infringe the patent, and that it was accountable therefor to appellee in the sum of $76,082.07. He found in its favor both for profits received by the appellant company and damages sustained by appellee on account of the sale of said drills. The amount of profits which he found said company had so received was $1,729.69. The damages which he found appellee had sustained he divided into two items. One item amounted to $46,122.26, and was for the profits which appellee would have made had it made and sold that number of its shoe grain drills, assuming that the making and sale thereof would have involved a proportionate increase in its expenses of administration, operation, and selling. The other amounted to $28,232.62, and was for additional profits appellee would have in fact made because such assumption would not be correct, inasmuch as the making and selling thereof would not have involved such proportionate or even a material increase therein. The lower court on the hearing of exceptions to the special master's report approved his finding as to profits received by the appellant company, and as to the first item of damages sustained by appellee, but disapproved his finding as to the second item of such damages. A decree was entered accordingly in favor of appellee for the sum of $47,851.95. It is from this decree that this appeal is taken. A cross-appeal has been taken by the appellee because of the rejection of said

second item of damages and of the refusal of the court to treble the amount of damages allowed.

First, as to the appeal. The position of the appellant company as to the finding of the special master that it had received said amount of profits from the sale of said drills and should be charged therewith is that in fact it received no profits whatever from the sale thereof, and that, if it did, it should be charged only with so much of the profits received as was attributable to the patented feature of the drills, the burden of showing which was on the appellee, and that it has not shown how much thereof was attributable thereto. As to this last branch of said appellant's position, appellee contends that the patent covered not some part of the drill, but the entire machine; that it was not for an improvement on a shoe grain drill as it is characterized in the patent, but in reality was for an improved shoe grain drill; and that, therefore, all the profits received were for the patented article, and it is entitled to the whole thereof, or that if, in fact, the patent was only for a particular feature of the drill, to wit, the spring pressure device, that the profits received from the whole drill were attributable solely to that device, and on this ground, therefore, it is entitled to the whole thereof. The special master, and the lower court in approving his action in this particular, based the allowance of the whole profits received on this latter ground. In the case of Canda Bros. v. Michigan Malleable Iron Co., 152 Fed. 178, 81 C. C. A. 420, we held that, if a patent covers only a particular feature of an article sold by an infringer, the burden is on him in a suit against him to recover the profits received from such sale to show that they were not attributable solely to the patented feature thereof, and that it is only in case the infringer sustains this first burden that the second burden rests on the patentee to apportion said profits between such feature and the rest of the article.

There was evidence tending to show both that the appellant company received said amount of profits from the sale of said drills, and that the profits arising therefrom were attributable solely to said spring pressure device, which it contends was all that was covered by the patent. The findings of the special master that such was the case, approved by the lower court, must, therefore, be presumed to be correct, and, in the absence of clear evidence of mistake or error, should not be set aside or modified. To say the least, we find no such clear evidence in the record, and for this reason we feel bound to affirm the action of the lower court in this particular.

Then as to the first item of damages allowed by the special master, which the lower court approved. It is a portion of the profits which he found the appellee would have made had it sold to the persons to whom the appellant company sold said 3,496 drills of its make in addition to those which it did sell. Said company questions whether appellee would have made profits to the amount of this item had it so done, and raises the same question as to the apportionment of such profits as it would have so made that it raised in relation to the profits which it made by the sale of said 3,496 drills. And back of these two questions it is contended that there is no sufficient legal evidence tending to show that appellee would have sold that or any other certain

number of its drills to said persons had not appellant company sold them its drills. Of course, if this contention is correct, then appellee is not entitled to any allowance on account of the profits that it would have so made. Walker on Patents (1st Ed.) § 563, states, as one of the two methods of assessing damages for infringement of patents, available where the patentee keeps his patent within a close monopoly by not granting licenses, the ascertainment of "what the plaintiff would have derived from his monopoly if the defendant had not interfered, but which he failed to realize because of that interference with his rights." It is this method that is involved here. Further, "in order," as he states, "to show that a patentee would in fact have made a particular profit if an infringer had not forestalled his sales," he says that "it is necessary to show that he would, but for that infringer, have made those sales; and to that end it is necessary to show that he could have supplied the articles wanted, and that the persons wanting those articles would have bought them had no infringer interfered." In order, then, to uphold the action of the lower court in the particular under consideration, there must be evidence tending to establish two things. One is that appellee could have supplied 3,496 drills of its make in addition to those it did supply; the other, that the persons who bought from the appellant company that number of drills of its make would have bought from appellee a like number of drills of its make had not they so bought from appellant company. It is not sufficient that there is evidence to establish either—there must be evidence tending to establish both.

As to the first proposition, it may be said that there is evidence tending to establish to a certain extent, at least, that appellee could have supplied that additional number of drills of its make. Appellee's sales manager testified that it had a plant capable of producing 24,000 drills per year, and the greatest number of drills it produced in any year during the infringing period did not exceed 7,000. Such fact, however, is hardly sufficient of itself to make out that appellee could have supplied that additional number of drills of its make. It should also have had sufficient capital to enlarge its business to this extent, or been able to obtain it. Concerning this, the record is by no means satisfactory. Nor was any attempt made at demonstrating that appellee's plant had such productive capacity. We have nothing more than the bald statement that it did. But perhaps it should be accepted that any successful business concern, as appellee was, can readily obtain under ordinary conditions sufficient capital to enlarge its business to the extent that the production of this additional number of drills would have involved on appellee's part, and, in the absence of anything to the contrary to said statement, that the plant did have such productive capacity. At any rate, it would seem that it cannot be said that there is any clear evidence that the master's report, in so far as it involved a finding that appellee could have so done, was so plain an error as to justify the court in ignoring the finding.

How is it, then, as to the second proposition? Is there any evidence tending to establish that the persons who bought from the appellant company the 3,496 drills of its make would have bought from appellee a like number of drills of its make had they not so bought from the

appellant company? Ordinarily the problem as to a matter of fact in a lawsuit is as to whether a certain thing in dispute has happened. Here the problem is as to whether a certain thing would have happened had not a certain other thing not have happened. In the one instance the problem is as to what is the fact; in the other, as to what in a certain assumed past contingency would have been the fact. In the nature of things it seems hardly possible for one to attain to as certain a degree of persuasion in the latter instance as in the former. What has happened may have been witnessed, and is likely to have left traces behind it. No such sources of factors of reasoning exist as to what has not happened. Yet, it is possible to reach a certain degree of persuasion as to whether a certain thing would have happened had a certain other thing not have happened. And the proper administration of justice sometimes requires that where a certain degree of persuasion is attained as to such a thing in question in a lawsuit that it be acted on. This happens particularly where the question relates to the matter of damages. But here, as where the problem is as to what has happened, there must be factors of reasoning, something from which an inference can be drawn, something that has "rational potency" or "probative strength," something that tends to establish that the thing in question would have happened had the other thing not have happened. We are not concerned here with the degree of persuasion that must be attained to in order to justify action thereon, only with emphasizing that there must be something tending to some degree at least to persuade. A mere guess or conjecture as to what would have happened will not do. All speculation in regard to the matter must be excluded. The word which expresses what is needed in such cases according to the Supreme Court is "data." In speaking of the question of damages in a suit for an infringement of a patent, in the case of Seymour v. McCormick, 16 How. 480, 14 L. Ed. 1024, Mr. Justice Grier said:

"Actual damages must be actually proved, and cannot be assumed as a legal inference from any facts which amount not to actual proof of the fact. What a patentee would have made if the infringer had not interfered with his rights is a question of fact, and not a judgment of law. The question is not what speculatively he may have lost, but what actually he did lose."

In the case of Mayor, etc., of New York v. Ransom, 23 How. 487, 16 L. Ed. 515, the same learned judge said:

"Where a plaintiff is allowed to recover only 'actual damages,' he is bound to furnish evidence by which the jury may assess them. If he rest his case after merely proving an infringement of his patent he may be entitled to nominal damages but no more. He cannot call on a jury to guess out his case without evidence. Actual damages must be calculated, not imagined, and an arithmetical calculation cannot be made without certain data on which to make it."

And in the case of Philp v. Nock, 17 Wall. 460, 21 L. Ed. 679, Mr. Justice Swayne said:

"The plaintiff must show his damages by evidence. They must not be left to conjecture by the jury. They must be proved, and not guessed at."

The same rule has been announced and followed by the Supreme Court in cases where lost profits were sought to be recovered for breach

of contract. In such cases the question is what would have happened, i. e., what profits the obligee would have made, had not something else have happened, to wit, the obligor breached his contract. See the cases of Howard v. Stillwell & Bierce Mfg. Co., 139 U. S. 199, 11 Sup. Ct. 500, 35 L. Ed. 147; Cin. Gas Co. v. Western Siemens Co., 152 U. S. 205, 14 Sup. Ct. 523, 38 L. Ed. 411; Anvil Min. Co. v. Humble, 153 U. S. 549, 14 Sup. Ct. 876, 38 L. Ed. 814. This is familiar law. But in dealing with a question involving its application it will aid one, in applying it, to feel it—to get, as it were, in its grip. This its statement and repetition in the language of the Supreme Court will enable one to do.

What evidence, then, is there in this case tending to establish that the persons who bought from the appellant company the 3,496 drills of its make would have bought from appellee a like number of drills of its make had they not so bought from the appellant company? The question should not be limited to the exact number of drills sold by the appellant company, to wit, 3,496. It should take in any number less than that. For, if there is evidence tending to show that any less number of said purchasers would have bought appellee's drills had they not bought the appellant company's, though the former would not be entitled to the full amount allowed, yet it might be entitled to a less amount. But in order to do this it must tend to establish that some certain number, or some certain number at least, of said purchasers would have so bought. If it does not, there can be no allowance to any extent, even though it be sufficient to satisfy one that an uncertain number thereof would have bought appellee's drills. Judge Clark in his opinion in the lower court truly said:

"Damages cannot be allowed when the amount or the extent of the damage is matter of speculation, or of guess, any more than in the first case above supposed, where the evidence is uncertain as to the existence of damages at all, or not."

There is certain evidence herein which it may be thought not only tends to, but does, establish that at least some of those persons would have bought appellee's drill had they not bought that of appellant company. It consists of certain portions of the testimony of appellee's sales manager and three of its general agents. We will not, however, at this point, attempt to state this evidence and determine its effect. It will be well, before doing so, to treat the case as if such evidence were not in it, and determine whether the circumstance that those persons did buy that number of appellant company's drills, itself or in connection with such other considerations as the case, so limited, presents, tends to establish that had they not done so they would have bought a like or any certain number at least of appellee's drill.

That circumstance indicates that those persons were subject to being induced to buy appellant company's drill from its agent. Possibly it indicates that they might have been induced to buy appellee's drill if offered on terms satisfactory and by an agent understanding the "talking points" of that drill. But that such was their psychological condition is not evidential of the fact that they would have bought appellee's drill on any terms had they not bought that of appellant company. For it to have any tendency in that direction it must have

been that said persons when they bought were aware of the existence of appellee's drill. Notwithstanding such may have been their frame of mind if they were not so aware, there is no possible room for any such conclusion.

Outside of the testimony hereinbefore referred to and yet to be considered, there is nothing indicating such awareness on the part of any of those persons except the fact of location within the same territory in which appellee was offering its drill for sale, and it, so far as it indicates awareness at all, indicates it only on the part of such of those persons as were located within that territory. It does not indicate it on the part of such of them as were not so located. It is important, therefore, to understand the extent of the territory in which appellee had offered its drill for sale up to the close of the infringing period, and how were appellant company's customers located as to this territory. Appellee's plant is at Dowagiac, Mich. It was organized in 1881, succeeding at that place others who began making shoe grain drills as far back as 1868. From that time until 1889 appellee operated mainly in Michigan and northern Indiana. Possibly as early as 1885 or 1886 it entered to a small extent the states of Wisconsin, Minnesota, North Dakota, and South Dakota, where spring wheat is grown, or some of them, and in 1890 its efforts therein were greatly increased. Its original territory it termed its "Home Territory." The subsequently added territory it divided into three separate departments, which it termed its "Madison Territory," "Minneapolis Territory," and "Fargo Territory," and the whole was known as the "Northwest." Each of these territories was in charge of a general agent, those in charge of the three departments of the Northwest being stationed at Madison, Wis., Minneapolis, Minn., and Fargo, N. D., respectively. Towards the end of the infringing period appellee seems to have entered Kansas, Indian Territory, and Oklahoma, and to have made sales at San Francisco, Cal., and Dallas, Tex., and during that time it sold scatteringly in other wheat-growing states. The bulk, however, of its business was done in the Northwest. It paid no special attention to and did not try to develop trade outside of the territory covered by its general agents as aforesaid. Its sales manager testified that its business policy was to seek no trade. Possibly he meant outside of the territory covered by its general agents, but he did not so limit his testimony. It sold only to local dealers, except so far as the sales at San Francisco and Dallas were concerned, which were to jobbers. It advertised its drills solely by catalogues and circulars—not by insertions in local newspapers. In 1889 it had two or three general agents; in 1890, seven. Besides these agents it employed what were known as "ninety-day men," to aid the local dealers, each year during the 90 days preceding seeding time, which began about April 1st. In 1893 it employed 4 such men, in 1890, 36; there being a gradual increase in the number of men so employed each year between. In 1891 its sales amounted to 2,000 or 3,000 drills; in 1899, to 7,000.

Until 1888 its shoe was the same as in the Hoyt patent, save that it was shorter; and until 1890, when its efforts in the Northwest were greatly increased, weight alone, supplied by either a heavy iron hopper

attached to the shoe, or by a chunk of iron attached to the hopper, was used for forcing the shoe into hard ground. At that time a change was made from weight to spring pressure. This was done to meet conditions existing in the Northwest. A greater range of pressure is demanded there because of the nature of the soil and obstructions in it. The soil at seeding time is sometimes dry and sometimes wet, and in some sections it is light and loamy, and in others heavy and compact. The obstructions in it consist of trash, such as stubble and corn stalks, which on account of the dryness of the atmosphere will not rot, and in the operation of the drill loads up in front and clogs it so that it has to be passed over or cut through in order to make progress. Such obstructions exist especially in northwestern Minnesota and North Dakota. The spring pressure adopted enables the drill to pass over the obstructions and sow the grain successfully. In 1890 the spring used was a flat bar attached to a rock shaft near the front of the frame of the drill and extended thence rearwardly to the shoe. In 1891 this device was superseded by the device described in the Hoyt patent. That device, however, was used only during that year. In the summer thereof a change was made by which the clamping plates were dispensed with and the pressure rods connected direct with the draft rods, and this method of construction was used ever thereafter. In the Northwest appellee sold mainly wide drills, i. e., drills having 17 or more, or on an average 20, shoes, and drawn by four horses.

How, then, were appellant company's customers located as to the territory covered by appellee? Its plant is at Middletown, Ohio. The sales of the first three years of the infringing period were, with a very few exceptions, to persons located in Missouri, Illinois, Kentucky, and Tennessee. It seems to have entered the Northwest for the first time in 1896. This it did by selling its drills outright to the Minnesota Moline Plow Company, jobbers at Minneapolis, the defendant in the case reported in 118 Fed. and 55 C. C. A., supra, who in turn sold to local dealers in the Northwest, who in turn sold to the farmers thereof. It continued to do this thereafter during the entire infringing period. In 1899, after this suit was brought, it seems to have made a raid into appellee's home territory, Michigan and northern Indiana, and in that year and in 1900 it raided Wisconsin also. Out of the 3,496 drills in all sold by it, at least 850 of them were to persons located outside of the territory covered by appellee's general agents. They were mainly located in Missouri, Nebraska, Illinois, Kentucky, Oregon, Georgia, and Tennessee, and some of them in New York, Iowa, Kansas, Ohio, and Pennsylvania. The remainder thereof were sold to persons located within the field of appellee's operation. As to the purchasers of said 850 drills, there is not the slightest ground for inferring that at the time they bought they were aware of the existence of appellee's drill. They were located in territory not covered by appellee's general agents, and where at least it was the business policy of appellee not to seek or develop trade. The mere fact that, where they were located, appellee may have sold its drill scatteringly, is not sufficient to justify an inference of such awareness on their part.

Is, then, the fact of location within the territory covered by appellee's general agents, which may be characterized as the field of appellee's operation, sufficient to justify an inference that the purchasers of the remainder, or of a certain number at least, of said 3,496 drills of appellant company's make were aware, at the time they bought, of the existence of appellee's drill? It is quite likely that some, if not many of them, were so aware. Possibly it is more likely that such of them as were located within appellee's home territory where its operations had been long continued were so aware than such of them as were not. As to the Northwest, it did not make any considerable effort therein until three years before the beginning of the infringing period. That is quite a large territory, containing slightly less than 300,000 square miles, and there were in it a great number of wheat growers. As more fully shown hereafter, broadcast seeders, hoe drills, and many makes of shoe grain drills were in use therein for sowing wheat. The evidence establishes that a drill embodying appellee's patent was and is the best machine for sowing grain in that territory, because of its spring pressure device, which enables it readily to overcome the obstructions heretofore referred to. But notwithstanding this, it does not appear that appellee made an attempt to cover the entire territory at once. Its efforts seem to have widened with the years as they went by. One of appellee's witnesses, Mr. Gregg, a Minnesota farmer since 1870, operating a 500-acre farm on improved lines, and for 15 years superintendent of the Minnesota Farmers' Institute, who has been over that state many times and had visited the two Dakotas to a limited extent, seems to have known but little of any other shoe grain drills in those states than the Havana press drill, one of which he purchased in 1885, and appellee's drill, one of which he purchased in the early 90's, when during that time there were many other shoe grain drills in use therein besides these two. That some of appellant company's customers in that locality were more ignorant of appellee's drill than he seems to have been of such other drills is not at all unlikely. In view of these considerations we find it quite difficult, in the absence of anything else, to say that the purchasers of all, or any certain number at least of said 3,496 drills located within appellee's field of operation, being the purchasers of all except 850, were at the time they bought aware of appellee's drill.

If this cannot be said, then, nothing else appearing, there is no possible basis for holding that the purchasers of all, or any certain number at least, of said 3,496 drills of appellant company's make, would have bought appellee's drill on any terms had they not bought the drill of appellant company. It cannot be so held as to those purchasers who were located outside of appellee's field of operation and who represent 850 of said drills, because there is nothing tending to show that any of them were aware at the time they bought of appellee's drill. Nor can it be so held as to those purchasers who were located within appellee's field of operation, and who represent the remainder of said 3,496 drills, because it cannot be said that all of them, or those representing a certain number thereof at least, were aware at the time they bought of appellee's drill. But even if it can be so said, and not only this but that appellee's drill was actually offered to them,

it cannot, because of two other factors, be held that they would have bought appellee's drill had they not bought that of appellant company. One was that many kinds and makes of machines for sowing wheat other than the shoe drills of appellee and appellant company were in use and offered by the trade during the infringing period in the field of appellee's operation. They were broadcast seeders, hoe drills, other kinds, and many other makes of shoe drills and disc drills. The original machine was the broadcast seeder. After it came the hoe drill, then the shoe drill, and finally the disc drill. Though the shoe drill, particularly one embodying appellee's patent, was much better adapted to sowing wheat successfully than either the broadcast seeder or hoe drill, neither had been completely eliminated at the close of the infringing period.

Appellee's sales manager testified that one of the circumstances which it took into consideration in estimating annually the number of shoe drills to be made by it was the rapidity of the change by farmers from broadcast seeders to shoe drills, and that at the time he testified, which was after the end of the infringing period, the shoe drill had then almost entirely supplanted the broadcast seeder in Minnesota and the two Dakotas. He further testified, however, that appellee began in 1895 for the first time to make broadcast seeders and hoe drills; that in 1896 it sold less than 100 of each; that in 1897, 1898, and 1899 it sold more of each kind, 200 or 300 of each, besides 300 or 400 cheap hoe drills. As to hoe drills it is testified that in southeastern Minnesota more hoe drills have always been used than shoe drills.

The shoe drills were of three kinds. One kind was where there were no carrying wheels, and the weight of the machine was divided between the shoes and the following press wheels. Of this kind there were two makes, the Havana Press Drill, made by Stoddard & Co., of Dayton, one of which Mr. Gregg purchased in 1885, as heretofore stated, and the Ashurst. Mr. Gregg testified that at that time he had and was still using his Havana press drill under certain conditions where it did better than appellee's drill, which he owned also, and that in certain portions of North Dakota and Minnesota, where the soil is very loose and a press wheel is desired, such drills and drills of that character and style were then largely used. The Ashurst went into the Dakotas in 1889. In 1899 its sales were greatly decreased, and it was practically out of the market. Another kind of shoe drill in use and offered by the trade in appellee's territory during the infringing period was one where the spring pressure device was a coil spring instead of a rod spring, as in appellee's patent. Of these there were a great number of makes. Amongst them were the Van Brunt drill, of Van Brunt & Wilkins, of Horicon, Wis.; the Superior drill of the Superior Drill Company, of Springfield, Ohio; the Tiger drill, of Rowell Company of Beaver Dam, Wis.; and the Hoosier drill, of the Hoosier Drill Company, of Richmond, Ind.—which were the chief makes of that kind of shoe drill. There were probably others. The shoe drill, with such a spring pressure device, preceded that with the rod spring. But it was not

as successful a machine as the latter, particularly in localities where it came in contact with obstructions of the character hereinbefore referred to, and it has been gradually supplanted by the latter, except as to one make. That make is the Van Brunt. In 1892 it appeared with a device for raising and lowering the toe of the shoe, and in dealing with such obstructions it is fairly successful, sufficiently so to be able to maintain itself in competition with the shoe drill having a rod spring as its spring pressure device. The other kind of shoe drills was the one where the rod spring was the spring pressure device. Hoyt, appellee's assignor, was the inventor thereof. But appellant company was not the only other maker of such drills besides appellee. There were a number of other infringers of appellee's patent. Besides appellant company's drill there was the Kentucky drill, of Brennan & Co., of Louisville, Ky., held to infringe in the case of 127 Fed. and 62 C. C. A., supra; a drill made by the Cassopolis Manufacturing Company, of Cassopolis, Mich., held to infringe in the case in 121 Fed. and 58 C. C. A., supra; the Peoria drill, of Selby, Starr & Co., of Peoria, Ill.; the Richmond Champion drill, of the Wayne Works of Richmond, Ind.; and, possibly, also, drills made by the National Drill Company, of Dublin or Liberty, Ind., and by the Monitor Manufacturing Company, of Minneapolis, Minn.—all or most of which drills have also been held to infringe appellee's patent. The sales of the Kentucky drill during the infringing period, and mainly in the field of appellee's operation, were greatly more than appellant company's drill, possibly as many as 10,000, and the sales of the other infringing drills amounted possibly to as much as 5,000 or 6,000. Then as to the disc drill. It was introduced about 1898. This drill requires no previous plowing for preparing the soil for seeding, but cultivates the ground at the same time that it sows the grain. Of course, such a drill is adapted to dealing with obstructions of the character stated, inasmuch as it will cut through them. But inasmuch as the ground is generally plowed prior to seeding in the Northwest, it does not seem to have been generally introduced in that portion of appellee's field of operation. Upon its introduction, however, it made rapid progress, and appellee with many other manufacturers engaged in pushing it. In offering these different kinds and makes of seeding machinery to the wheat growers of appellee's field of operation, there were possibly as many as 15 different concerns engaged. Each was in active competition with the other, and each had its numerous agents extolling the virtues of its particular kind or make of machine and offering it for sale on such terms as it saw fit.

The other factor referred to above is that the price at which appellant company sold its drills was much less than the price at which appellee offered its drill and was willing to sell. In view of these two additional factors, it would seem to be impossible for one to say that all of the purchasers of appellant company's drill located within appellee's field of operation, or so many of them as represented a certain number at least of the drills which it sold therein, would have bought appellee's drill had they not bought that of appellant com-

pany's, even though at the time they bought they may have been aware of appellee's drill and it was actually put at them to buy.  At that time those persons either already had seeding machinery or they did not have it.  If they then had such machinery, it is quite likely that it was machinery inferior in merit to a drill embodying appellee's patent like that of appellant company and appellee's drills, such, for instance, as a broadcast seeder, or a hoe drill, or a shoe drill of the Havana type, or with a coil spring other than the Van Brunt.  If it was of equal merit, it is not likely that they would have made any further purchase.  In such case it is possible that at the same time there were offered to them, besides the drills of appellant company and appellee's other drills of equal merit with them, or substantially so, such as the Van Brunt, or the drills of appellee's other infringers, or possibly, if it was in 1898 and after, a disc drill.  It is just as likely that the Van Brunt and the drills of appellee's other infringers were then offered them as that appellee's drill was.  If they did not then have seeding machinery and were buying for the first time, it is possible that said inferior machinery, as well as that of equal merit, came in competition with appellant company and appellee's drills.  This is just as likely as that appellee's drill was then offered them.

That appellant company in the first alternative succeeded in displacing the inferior machinery, or in the second won out as against it, is not evidential that appellee would have done likewise had appellant company not been there, for it may have been that it was appellant company's price that enabled it to do so, and that, therefore, appellee's price would have been against its being able to do likewise.  But even if it was not appellant company's price that enabled it to do so, but the merit of its drill, its price simply enabling it to win out as against appellee, it does not follow that appellee would have sold had not appellant company been there, for the Van Brunt and the drills of appellee's other infringers, and possibly the disc drills, drills of equal or substantially equal merit with appellee's drill, were there and offered, at least so far as the Van Brunt and drills of said other infringers were concerned, at a lower price than appellee's.  Indeed, if appellant company had not been there, it would seem to be more likely that the sale would have gone to some one of appellee's other infringers than to appellee, and just as likely that it would have gone to some one of them as to appellee had their prices been the same as appellee's.  The existence of this inferior machinery alone in connection with the fact that appellant company's price was much lower than appellee's is sufficient to interfere with one's concluding that all or so many of said purchasers would have bought appellee's drill had not appellant company offered its drill, even though they may have been aware of the existence of appellee's drill and it had been put at them to buy.  The existence of the Van Brunt drill alone, without reference to such fact, is sufficient to interfere with one's so concluding.  Possibly the existence of the disc drill is also alone sufficient to that end.  The existence of the drills of appellee's other infringers, even though they had been offered at appellee's price,

is alone sufficient to interfere with one's so concluding. But certainly, in view of the existence of all this seeding machinery and the fierce competition between the sellers thereof that covered the entire field of appellee's operation during the whole infringing period, it is the purest speculation, at least in the absence of the evidence which we have laid aside for the time being, for one to say what all or so many of said purchasers would have done had they not bought appellant company's drill, much more so, if that were possible, that they would have bought appellee's drill had they not done so.

What, then, is that evidence, and what is its effect? As stated, it is a portion of the testimony of appellee's sales manager and three of its general agents. Its sales manager testified that in the immediate vicinity of Dowagiac, where its plant was located, it sold to the farmers on an average 20 to 30 drills per year; that in 1898 (probably meaning 1899) one of its former general agents, who had left appellee and engaged with appellant company, placed an agent at Dowagiac and immediately began selling its drill at about $20 per drill lower; that during that year appellant company secured the most of said trade and appellee's sales were very few, but in 1900 and 1901 it reduced its prices and kept a canvasser out with a team several months in each year, and it succeeded in getting nearly all of the trade. He further testified generally that the sale of appellant company's drill had quite materially affected the sales of appellee's drills, because of them being built so nearly on the same lines and being sold at lower prices; that just to what extent it affected them was problematic, but that it materially curtailed them and to some extent affected its prices. Appellee's general agent stationed at Madison, Wis., during the years 1899 and 1900, the years when, as before stated, appellant company made a raid into that state, testified that in those years appellant company offered its drill in Wisconsin at a much less price than appellee's price for its drill; that it sold its drill to eight named dealers, who, prior to that time, handled appellee's drill and had not handled appellant company's; that this competition reduced the number of sales of appellee's drills, and that in his opinion if appellant company had not been in the market a like number of appellee's drills would have been sold, instead of appellant company's. Appellee's general agent, stationed at Minneapolis, Minn., since 1898, testified that in the fall of 1898 he came in contact with dealers who told him that appellant company's drill had been offered to them at a great reduction from appellee's price; that in 1899 some of them reduced their order of appellee's drill, and at the time of settlement told him that they had sold appellant company's drill. He further testified that since that time the latter drill had been in strong competition with appellee's, and was offered at such low prices that he could not compete and consequently lost agencies, and his orders were in many instances cut in on. He gave two instances: One, where appellee lost a sale to six farmers at Bellevue, Minn., and the other at Hoffman, Minn., where appellee only sold seven or eight drills, when it had usually sold a full car load each year. Both these instances, however, happened in 1901, after the close of the in-

fringing period involved herein. Appellee's general agent at Fargo since 1897 or 1898 testified that he had met with strong competition from appellant at Graceville and Hallock, Minn., and Larimore, Church's Ferry, Leeds, and Langdon, N. D.; that in 1899 appellant company sold to appellee's local dealers at Hallock, Minn., who had been such for five or six years previous, and appellee was unable to sell to them at all on account of price; and that in the same year appellant company also secured appellee's local dealer at Langdon, and it was compelled to put a salaried man there and sell its drill to farmers at nearly wholesale prices, in order to sell any at all. He testified generally that, in his opinion, he could have sold at least 75 per cent. of the drills appellant company had sold in addition to his regular trade, and that the offer of appellant company's drill at cut prices caused appellee to lose a great many sales.

This is all the evidence of this character which the record contains. Several things in regard to it are to be noted. In the first place, one is impressed with the paucity of instances which appellee has presented of appellee coming into direct competition with it during the eight years covered by the infringing period. The only cases given are that at Dowagiac, in appellee's home territory; that at eight different places in its Madison territory; that at two different places in its Minneapolis territory, after the close of the infringing period; and that at six different places in its Fargo territory. Again, assuming that it is enough to engender the opinion that appellee did lose some sales by reason of the competition of the defendant, it does not present any data by which the master or this court could say that so many sales made by defendant were sales which would have been made by complainant but for its interference. If it does not do this, there is no ground for more than nominal damages. Further, this evidence suggests that possibly it was within appellee's power to have made out that it lost a certain number at least of the sales made by appellant company, and this by proving at least the number of drills the appellant company sold to the eight dealers in appellee's Madison territory and to the six dealers in the Fargo territory referred to above, who were old customers of appellee. It might be reasonable to conclude that if appellee's old customers had not bought appellant company's drills they would have bought a like number of appellee's.

In the case of Zane v. Peck (C. C.) 13 Fed. 475, Judge Shipman said:

"I think that the master was justified by the testimony in finding that but for the infringement the plaintiffs would have made the sales of their faucets to their old customers, which were made to them of the infringing faucets by the defendants."

Still, further, the opinions of said witnesses that appellee lost sales by reason of appellant company's sales or as to the extent of its losses does not help matters. As said by Judge Sanborn, in the case of Central Coal & Coke Company v. Hartman, 111 Fed. 96, 49 C. C. A. 244:

"The speculations and conjectures of witnesses who know no facts from which a reasonably accurate estimate can be made form no better basis for a judgment than the conjectures of the jury without facts."

And, finally, we have appellee's sales manager's word for it that the extent to which appellant company's sales affected the sales of appellee is "problematic." If the evidence in the record gets us no further than this, as to that extent no allowance can be made appellee for sales lost.

Such, then, is substantially all that the record presents us that can be claimed to have a tendency to make out that appellee would have made the sales which appellant company made had it not made them. There is nothing in it tending to establish that appellee lost all, or any certain number at least, of said sales. There are other slight considerations presented in the evidence which tend to render the matter more uncertain, but it is not necessary to make any detailed reference to them.

We have treated the question presented for determination here as being whether appellee would have made said sales had not appellant company made them, and not as whether appellee or some other infringer of its patent would have made them had not appellant company made them. It cannot be maintained that, if the evidence established that appellee or some other such infringer would have made said sales, or some certain number of them at least, had not appellant company made them, the appellee would be entitled to recover from appellant company as damages the profits which it would have made had it made said sales or such certain number thereof. There was no concert of action between appellant company and said other infringers. Each one was acting on its own account, and neither was responsible for the action of the other. But the evidence did not tend to establish this. In the state of the evidence it is not possible to say that many of the purchasers of said drills would not have retained or purchased inferior machinery, or the Van Brunt drill, possibly of somewhat less and yet substantial merit, or the disc drill, had they not bought the drill of appellant company, and, if so, how many of them would have so done.

It is not enough to show that it is probable complainant has lost some sales and therefore sustained some damages. Damages cannot be given upon such a conjectural basis. Seymour v. McCormick, Mayor v. Ransom, and Philp v. Nock, cited heretofore. To say that every farmer who bought an improved spring shoe drill would have bought the Dowagiac drill when the field was full of competition selling the drill of other infringers with whom the McSherry Company was not in accord, or a drill of some other make, is the wildest speculation, and ignores the well-known effect of the methods employed for exploiting such mechanism. In Reed v. Lawrence (C. C.) 29 Fed. 920, Judge Severens, referring to such a contention, said:

"To say that every purchaser would have bought a spring-toothed harrow having the peculiarity of the Garver patent, and would have bought no other spring harrow, is impossible, without ignoring what is constantly happening throughout the country."

In Tatum v. Gregory (C. C.) 51 Fed. 446, the petition claimed the profits he would have made upon sales made of an infringing device; Judge McKenna, now Mr. Justice McKenna, denied the sufficiency of the evidence upon which the master had allowed such dam-

ages. The very learned judge in respect of the evidence to make out such damages, after referring to the inadequacy of some evidence claimed as direct evidence that particular sales had been lost through the presence of the infringer in the market, said:

"And no presumption can be safely indulged in against the fact that there were other competitors of complainants besides respondents, other edgers, and other infringers. If the other edgers are conceded to be inferior, they were cheaper, and the testimony shows were salable; and there are suits pending against other infringers. In this condition of things and the evidence, it would be incurring too much risk of doing injustice to decide that plaintiffs would have made the sales which respondents made. In other words, that the purchasers from respondents would not have bought them or another. some other edger, or bought the same edger from another infringer, but would have bought of plaintiffs at a higher price; that they would not have done what the witness said they did do. I do not think, therefore, that the evidence sustains the finding of the master that the plaintiffs incurred $1,742.62 damages by respondents' sales."

No case cited by appellee shows an allowance of damages for sales lost upon any such line of evidence as that upon which the decree of the court below was based. The case of Manufacturing Company v. Cowing, 105 U. S. 253, 26 L. Ed. 987, which has been much relied upon, was a totally different case upon its facts. That was a case in which the question was whether the entire gain of the defendant in making and selling an infringing device was a loss sustained by the patentee. The device of the patent was an improved pump, which had superseded all other pumps in use for pumping gas. There was no market for this pump except in the oil-producing region of Pennsylvania and Canada, and less than a thousand supplied the demand. It was also found that the infringer could not enter the field unless he took the improvement of the patentee and added to his old-style pump, and the court found without the improvement no sales would have been effected. Upon this state of facts the court said:

"This is an exceptional case. A limited locality required a particular kind of pump, to be used only in that locality for a special purpose. The market was not only limited to a particular locality, but it was unusually limited in demand. A single manufacturer possessing the facilities the appellant had could easily, and with reasonable promptness, fill every order that was made. There was no other pump that could successfully compete with that controlled by the patent. Under these circumstances it is easy to see that what has been the appellees' gain in this business must necessarily have been the appellant's loss, and consequently the appellant's damages are to be measured by the appellees' profits derived from their business in that special and limited market. This, as it seems to us, is the logical result of the rule which has been stated. By infringing on the appellant's rights, the appellees obtained the advantage of the increased marketability of their pumps. The action of the court below, therefore, limiting the field of inquiry as to damages, cannot be sustained."

Appellee's counsel does not contend that there are any data in the record from which it can be argued that appellee would have made all or any certain number at least of those sales had not appellant company made them. His position is that, by certain action on its part, appellant company prevented appellee from showing that such was the case, and that therefore it should be treated as if it had shown it. In the course of the preparation of this case in the lower court, appellee placed the manager of the Minnesota Moline Plow Company, the jobber to whom

a large number of said 3,496 drills were sold by appellant company between 1898 and 1900, against whom appellee then had a suit pending in the Circuit Court for the District of Minnesota, which resulted in the decision reported in 118 Fed. and 55 C. C. A., referred to above, on the witness stand within said District of Minnesota, and asked him to give the prices at which said plow company resold the drills so purchased by it to dealers, and to produce its book of account with its customers showing the number of drills which it had so resold. On advice of appellant company's counsel, the witness declined to answer the question and to produce said books. Thereupon appellee applied to Judge Lochren, sitting as Circuit Judge of said court, to make an order requiring the witness to answer and to produce, and the said plow company made an application to him to make an order in said suit against it preventing appellee from making an inquiry of its officers or employés as to the contents of said books or as to the persons to whom or the prices at which the drills purchased from appellant company were resold by it. Said judge denied the former motion and granted the latter. This is the action on the part of appellant company which is relied on as relieving appellee of the burden of making out its case in the particular now in question. It is claimed that if it had not thus been balked it would have shown who the exact customers of the plow company were, and with this information could have shown further why they purchased appellant company's drill and that they would have purchased appellee's drill had they not done so.

It is not entirely clear, to say the least, that appellee in this matter had any such ultimate purpose in view. We are somewhat impressed with the notion that the object of this inquiry was solely for the purpose of showing the prices at which said plow company resold said drills, upon the idea either that it could recover of appellant company the profits which said plow company made upon such resale, or that it would show that said prices were considerably less than appellee's, and thereby tend to make out that it lost the sales which were so made. But it is not important that we state the grounds of this impression. Appellee in the instance heretofore referred to did prove who certain of the exact customers to whom said plow company sold appellant company's drill were, and that they were its old customers, and it could have shown through them exactly how many drills they bought from the plow company, but it did not do so. Appellant company had the right in good faith to take the position that appellee was not entitled to this evidence, and there is nothing impugning its good faith in the matter.

Judge Lochren held that it was right. Appellee could have questioned his action in the appellate court and had him set right if in error, but this it did not do. This it did as to similar action had in the Brennan Case pending in the Circuit Court for the Western District of Kentucky, and it was held that appellee was entitled to the evidence it sought, even though it may have been irrelevant. Dowagiac Mfg. Co. v. Lochren, 143 Fed. 211, 74 C. C. A. 341. We fail to see anything in appellant company's preventing in this way the introduction of this evidence to relieve appellee of the burden of mak-

ing out its case. No presumption exists that if appellee had been allowed to have its way it would have made it out.

When we come to consider the report of the special master and the opinion of the lower court, all that we find relied on as upholding the allowance of these damages is the fact that appellee could have supplied 3,496 drills in addition to what it did supply, and the further fact that appellant company was a wanton and malicious pirate. But the fact that appellee could have supplied this additional number of drills is not sufficient in and of itself to entitle appellee to the damages allowed. It must appear that it would have sold them had not appellant company made the sales it did. The burden was on appellee to introduce evidence of data from which this could be inferred. It was not relieved of this burden by the fact that appellant company was a wanton and malicious pirate. It is questionable whether it was such, and whether more can be said of it than that it was a stubborn defender of what it believed were its rights, though the way in which, after it was sued, it raided appellee's home and Madison territories with appellee's former general agent at Madison in charge of its forces may be thought to indicate a degree of viciousness. But, however this may be, the quality of the act of infringement complained of had no relevancy on the question as to whether the sales which appellant company made, or a certain number of them at least, were sales lost by appellee, which was essential in order for appellee to be entitled to the damages allowed. Any consideration thereof when that problem is up for solution is calculated to interfere with the free play of one's mind thereon.

Our conclusion, therefore, is that the appellee was not entitled to be allowed damages for profits that it would have made had it sold any of the drills which appellant company sold. There is some evidence that it was compelled to reduce its prices slightly and to incur additional expense in employing more men to push its drills by reason of the competition to which it was subject. But no allowance was made or is claimed on that account. It is not clearly made out just what its loss in this particular was, and the evidence comes short of showing that this loss was due to appellant company's particular competition, just as much so as it comes short of showing that appellee would have made the sales which appellant company made had not it not made them.

The decree awarding more than nominal damage to appellee is reversed as to the appellant company.

This decree is also appealed from by the individual appellants, C. B. Oglesby and T. O. Eichelberger. It was claimed at the time the suit was brought that they were respectively the president and the secretary and treasurer of the appellant company. It is made a question whether they are sued, and the decree is against them in their official or in their individual capacity. It is also questioned whether, even though appellee may have been entitled to all the relief granted as against the appellant company, it was entitled to any relief whatever against them in either capacity. We do not find it necessary to dispose of either question. As appellee was not entitled to a decree against appellant company for any damages, it was not entitled thereto against

the other appellants. So far as the profits are concerned, though entitled to the decree therefor as against the appellant company, it is not entitled thereto as against the other appellants. The appellant company alone received those profits. It is not claimed that the other appellants received any portion thereof.

The decree is therefore reversed in toto as to the individual appellants.

Then as to the cross-appeal. As appellee was not entitled to the first item of damages, it follows that it was not entitled to the second. And, as it was entitled to no damages at all, there was no room for application of the trebling statute. That statute has no relation to profits. It concerns damages alone.

As to the costs, it is equitable to divide them equally between the appellant company and the appellee in both the lower court and this court, and we so direct.

The cause is remanded to the lower court for further proceedings consistent herewith.

Simultaneously with said cause, there was heard and submitted an appeal by said Dowagiac Manufacturing Company from a decree of the lower court in favor of said C. B. Oglesby upon his so-called cross-bill treated in the lower court as an original bill, the relief which it sought and the ground thereof being set forth in the case of Dowagiac Mfg. Co. v. McSherry Mfg. Co. (C. C. A.) 155 Fed. 524, granting him the relief sought thereby. The ground upon which that relief was granted was that in the record in the foregoing cause said company was not entitled to a decree against said Oglesby. This was error. That relief was not sought on that ground. It was sought on the ground of fraud in the procurement of the decree whose enforcement was sought to be enjoined. The lower court had lost all control over its enforcement on any other ground. But inasmuch as we have reversed said decree for error, it is not necessary that we pass on the question of fraud. The decree in favor of Oglesby is therefore reversed, with direction to divide the costs as aforesaid, and this opinion will be filed in both cases.

RICHARDS, Circuit Judge, dissents.