### McSHERRY MFG. CO. v. DOWAGIAC MFG. CO.

(Circuit Court of Appeals, Sixth Circuit. May 8, 1900.)

No. 772.

1. PATENTS—INFRINGEMENT—EQUIVALENTS.

A patentee, although not a pioneer inventor, but an improver only, is entitled to a reasonable range of equivalents, measured by the advance he has made over older machines, and is not limited to the specific form claimed and described, unless he has expressly so limited himself, or unless such limitation is necessary in order to save his patent from anticipation.

**2. SAME—GRAIN-DRILLS.**

The Hoyt patent, No. 446,230, for an improvement in grain-drills, covers improvements of merit over prior machines, and is entitled to a reasonable range of equivalents. As so construed, *held* infringed as to claims 1, 2, 3, 4, and 5.

Appeal from the Circuit Court of the United States for the Western Division of the Southern District of Ohio.

This is a bill in equity to restrain the infringement of patent No. 446,230, granted February 10, 1891, to W. F. Hoyt for an improvement in grain-drills. The court below held the patent valid, and that the defendant had infringed the first three claims, but that the evidence failed to show the sale of any drills embodying the elements of claims 4 and 5. The sixth claim of the patent was not involved. From this decree both parties have appealed,—the complainant from so much of the decree as failed to find infringement of the fourth and fifth claims, and the defendant from the decree finding infringement of claims 1, 2, and 3. The object of the invention, as stated in the specifications, "is to provide an independent spring-pressure for each of the shoes and covering-wheels of the drill, whereby the work of the drill is rendered efficient in uneven ground, and to provide means whereby said shoes and covering-wheels may be raised from the ground when the implement is not in use, or when transporting it from one field to another." The claims of the patent in issue are as follows: "(1) In combination with the transporting-wheels and frame, the hopper, shoe, and draft-rods, the latter having a pivotal connection with the frame, the clamping-plates having a pivotal connection with the draft-rods, the spring-metal pressure-rods attached to said plates, said rods extending rearwardly of the hopper, the forked arm coupled to said rods, and means for raising and lowering said arm, substantially as specified. (2) In combination with a frame of a grain-drill, the hopper having a flange at the upper end, the shoe attached to the hopper, the curved draft-rods leading from the shoe and having a pivotal connection with the frame of the machine, a swinging head located between the upper ends of the draft-rods, spring-metal rods attached to the swinging head, said rods extending back of the hopper and below the flange thereof, said spring-metal rods being coupled to an arm, said arm having means for raising and lowering it, and means for locking the parts, for the purposes set forth. (3) In combination with the frame, hopper, shoe, and draft-rods, the plates pivotally attached between the upper portions of said draft-rods, said plates having the horizontal shoulders, said shoulders bearing upon the draft-rods, the spring-metal rods attached to said plates and passing rearward of and on opposite faces of the hopper, and means for applying pressure to the rear ends of said spring-metal rods, for the purpose specified. (4) In a grain-drill, the combination of the wheels and main frame, of a hopper, shoe, and draft-rods having a pivotal connection with the frame, means for applying spring-pressure to the shoe, comprising the pressure-rods having their forward ends coupled to the draft-rods and a lever at the rear ends, a wheel traveling in the path of the shoe, and spring-metal rods coupling said wheel and its journal-bearing with the spring-pressure rods, substantially as indicated. (5) In a seed-drill having a hopper, shoe, and draft-rods, the hopper having a projection on its periphery at the top, plates pivoted between the upper end portions of the draft-rods, spring-metal rods clamped between said plates, means for raising and lowering the rear ends of said rods, and a wheel traveling in the rear of the shoe, said wheel having a spring-pressure connection with the spring-metal rods leading from the draft-rods." The first three claims are for the drill without the press-wheel attachment. The next two are for the drill with the press or covering wheel attachment. Fig. 1 of the patent is an end elevation of the drill, with one of the transporting wheels removed, and showing the frame broken away. Fig. 2 is a perspective view of a portion of the drill embodying the improvements of the patent. Fig. 4 is an enlarged perspective of the clamping-plates detached, between which the spring-pressure rods of the shoe and covering-wheel are adapted to be secured. Fig. 5 is a perspective view of the scraper-plate and cap, adapted to be secured to the rear ends of the spring-pressure rods of the covering-wheel. These figures are set out on the following page for purposes of illustration.

Fig. 1.

Fig. 2

Fig. 4.

Fig. 3.

Charles M. Peck, for appellant and cross appellee.
Fred L. Chappell, for appellee and cross appellant.

Before TAFT, LURTON, and DAY, Circuit Judges.

LURTON, Circuit Judge, having made the foregoing statement of the case, delivered the opinion of the court.

The patent to Hoyt was for improvements in that class of grain-drills generally known as a "shoe drill." Such drills are used for sowing small grain in rows; the grain being dropped from a hopper into a furrow cut in the ground by a knife or point, called the "shoe," and then covered by a heavy chain dragged behind, or, as in the case of the structure covered by the fourth and fifth claims of Hoyt's patent, by a press or covering-wheel following the shoe. The answer put in issue the novelty and patentability of the invention of the patent. That issue was found against the defendants. No error has been assigned upon that portion of the decree, and the only questions for our consideration arise upon the defense of noninfringement.

The McSherry Manufacturing Company make and sell a drill which closely imitates the structure of the first three claims of the patent in suit. The defense is that the drill made by the McSherry Company does not include the "clamping-plates" of the first claim, nor any equivalent therefor. That claim calls for "clamping-plates having a pivotal connection with the draft-rods, and spring-metal pressure-rods attached to said plates." The draft-rods mentioned are the rods, H, of the figure above. They are the rods connecting the shoe, E, with the frame of the drill, and curve upwardly, and are slightly diverging, their upper ends being pivotally attached on the trunnions of plates secured to the under face of the front edge of the frame, C. The draft-rods of the defendants' structure have same construction and pivotal attachment. The spring-pressure rods of the shoe are the rods, I, of Figs. 1 and 2, shown on page 718. These spring-pressure rods, and a means for connecting them with the draft-rods, are thus described in the specifications:

"I indicates the spring-pressure rods of the shoe. Said rods are formed of one piece bent to a loop at their forward ends, as shown in Fig. 4, and extending rearwardly on each side of the hopper, F. The rear ends thereof are pivotally attached to the bifurcated end, h, of the arm, O, as shown in Fig. 2, the upper end of said arm being pivoted at r to the free or outer end of the swinging arm, N, the opposite end of the arm, N, being permanently secured at r¹ to the rock-shaft, K, which extends along the rear edge of the machine-frame, and which is actuated by the lever, M, attached thereto. The forward looped end of the rods, I, is secured between the clamping-plates, P, P¹, which are provided with the grooves, c¹ (see Fig. 4), in their adjacent faces, that receive said rods, and in which they are firmly held by the bolt, i, passing through said plates, which draws them tightly together upon said rods. The under plate, P, of said clamping-plates is provided with the lugs, e, having eyes therein that are adapted to receive the bolt, d, which passes loosely therethrough. The ends of said bolt pass through the adjacent faces of the draft-rods, H, and are firmly secured therein, as shown in Figs. 2 and 3, by which means the forward ends of the pressure-rods, I, are pivotally coupled to the draft-rods. The lugs, e, of the plate, P, extending between the draft-rods, H, keep the upper ends of said rods spread and in contact with the trunnions, c, of the supporting-plates, b. The plate, P, is also provided with the horizon-

tal shoulders, v, on each side thereof, that are adapted to engage the upper edge of the rods, H, for purposes hereinafter described."

In the McSherry structure there are found the same two spring-pressure rods, I, one lying on each side of the hopper, F. The mode in which these rods are pivotally attached to the draft-rods differs in detail from that of the patent. The appellants' spring-rods, instead of being looped and held between "clamping-plates" pivotally attached to the drag-bars, are divided and directly attached to the draft-rods by means of an eye formed on the forward end of each rod, which is adapted to receive a bolt which passes through the draft-rods near their upper ends; the bolt forming the pivotal connection between the spring-rods, I, and the draft-rods, H. Pivoted on the same bolt is a plate, which defendants' expert calls a "wedge-plate," having lugs formed upon it which lie between the spring-rods and the draft-rods, and engage the latter, thereby transmitting the pressure of the spring-rods to the shoe through the draft-rods. It is true that the defendants' structure has no clamping-plates, either rigidly or pivotally attached to its draft-rods. But clamping is but one way of attaching one thing to another. Attachment may be made in many ways without clamping. But what are the functions of Hoyt's clamping-plates? The thing he wanted to do, and the thing essential to the proper transmission of pressure to his shoes and covering-wheels, was to make a pivotal connection between his spring-pressure rods and his draft-rods, so that pressure might be transmitted or withdrawn through the engagement of the pressure-rods with the draft-rods. Whether this connection should be made by clamping the rear ends of his spring-pressure rods between clamping plates bolted together, the clamping-plates being pivotally attached to a bolt rigidly connecting the upper ends of the diverging draft-bars, or by attaching the rear ends thereof by means of eyes to a bolt attached pivotally to the upper ends of the draft-bars, was a matter of form. Whether the connection was made in one way or the other, it was essential that the pressure-bars should engage the draft-bars in order that they might transmit pressure through the latter to the shoes. Hoyt provided for such engagement by lugs on each side of his clamping-plates. The defendant did the same thing by lugs on a plate which they attached to the bolt passing through the eyes at rear ends of their pressure-bars. The essential thing in both cases was a means for transmitting the lever-regulated pressure of the spring-pressure bars to each shoe and covering-wheel independently of each other and of every other shoe and wheel. Each has used substantially the same means. The mode in which the connection should be made between the pressure and drag bars was a matter of form. The clamping-plates of Hoyt's patent are not of the essence or substance of his invention. It was one way, and a convenient way, for making such a pivotal connection as was desired. The defendants' pivoted-bolt and wedge-plate, having lugs, the pressure-bars being attached by eyes to the bolt, is mechanically an equivalent for the pivoted clamping-plates, having lugs; the pressure-bars being attached by clamping-plates between said plates of

the patent. The parts accomplish the same function in the same way, and constitute what in the second claim is called a "swinging head." But it is insisted that the patentee, by the language of his claims, and by the history of the art, must be limited to the precise mode of connecting his pressure-bars and draft-bars described in his specifications and called for in his claims,—in other words, that the patent is not infringed unless clamping-plates form an element in the infringing structure. The case turns here. Grain-drills were old. Shoes and press-wheels are elements found in other structures. The combination was regarded as sufficiently novel to justify a patent, and defendants do not deny its validity. None of the older patents which have been introduced show a mechanism which seems to combine the advantages and effectiveness of the structure of the patent. The same may be said of drills not covered by any patent, so far as the proof in this case goes. It is not always easy to point out with precision just what marks the difference between a new and successful structure and an old and less satisfactory mechanism. That Hoyt's drill is a marked improvement over older structures is most clear, on the evidence. Its lightness, durability, simplicity of construction and operation, seem established. Its long, elastic springs give it a wide range of action over uneven surfaces. It needs few repairs. These qualities have contributed to its popularity, and brought it into extensive use. The novelty of the combination is not disputed. Its utility and success are proven facts. There is nothing in the history of the art, as developed in this record, which would make it necessary that Hoyt should be limited to clamping-plates pivotally attached to the draft-bars, as a means of pivotally connecting his pressure and draft bars. It is true that he calls for clamping-plates in his claims, and that he does not claim any other method of making his connection. But he has not shown any intention to confine himself to that specific mode of connection. The form he describes and claims is not of the essence of his invention, and the law allows a patentee any form which is the equivalent of that claimed, unless he has expressly limited himself to the one claimed and described, or unless it is necessary to limit him to the specific form in order to save his patent from anticipation. Hoyt was not a pioneer. But his invention is clearly a meritorious one. In such case he is not cut off from a reasonable range of equivalents measured by the advance he has made over older machines. In Bundy Mfg. Co. v. Detroit Time-Register Co., 36 C. C. A. 375, 94 Fed. 524, we said:

"To be entitled to the benefit of the doctrine of equivalents, it is not essential that the patent shall be for a 'pioneer invention,' in the broad sense of that term. If his invention is one which has marked a decided step in the art, and has proven of value to the public, he will be entitled to the benefit of the rule of equivalents, though not in so liberal a degree as if his invention was of primary character. Mr. Justice Jackson, in Miller v. Manufacturing Co., 151 U. S. 186, 207, 14 Sup. Ct. 310, 318, 38 L. Ed. 131, said, 'The range of equivalents depends upon the extent and nature of the invention.' The meritoriousness of an improvement depends—First, upon the extent to which the former art taught or suggested the step taken; and, second, upon the advance made in the usefulness of the machine as improved."

101 F.—46

In discussing the seventh claim of the Chambers patent, in Penfield v. Chambers Bros. Co., 34 C. C. A. 579, 587, 92 Fed. 639, Judge Severens stated the rule of equivalents very clearly, by saying:

"This invention, although an improvement, was one of great merit, and a large advance upon anything which had gone before. The doctrine of Miller v. Manufacturing Co., 151 U. S. 205, 14 Sup. Ct. 310, 38 L. Ed. 121, is invoked to prove that where an invention relates to an improvement, merely, the inventor is restricted to the precise construction which he has detailed. But I take it that that doctrine is not absolute, and, when rightly construed and expounded, means this: That the rule applicable to the determination of equivalency depends upon the importance and the breadth of the original invention, and does not depend upon the question whether it was the first in the field relating to that subject, but upon the degree of advancement which the invention has made in newness of discovery and utility; for there may be as much merit in bringing on a large illumination from a feeble start, as in the conception of the first beclouded idea which may have originated the course of study and discovery along that line. The rule is not a hard and fast one, but measures equivalents by looking to see what has been accomplished before, and finding whether the combination, read broadly, had been anticipated, or whether, having reference to what had already been shown, the claim must be limited to the precise construction in order to save it as being new; for the constant rule is to give to the inventor the benefit of all that he has invented. If he has improved only a little, he has only a correspondingly narrow standing ground. If he has improved much and widely, the area of the field in which he is to be protected is enlarged to the limits of what his invention has made its own."

To the same effect are McCormick Harvesting Mach. Co. v. Aultman, Miller & Co., 16 C. C. A. 259, 69 Fed. 371; and Muller v. Tool Co., 23 C. C. A. 357, 366, 77 Fed. 621. The second and third claims of the patent are substantially identical with the first. The swinging head of the second claim is the pivoted clamping-plates of the first claim. If the first claim is infringed, the second is, also.

As to the fourth and fifth claims of the patent: These include the structure of the first three claims, with the press or covering-wheel added. By a stipulation, defendants admitted that prior to this suit they have made and sold grain-drills, with press-wheel attached, such as shown on page 16 of an illustrated catalogue issued by them. Their superintendent, Horace G. Swope, testified that they had in stock some 300 press-wheels and spring attachments such as shown by the drawing in the catalogue above referred to, but that none had been made or sold since his connection with the business, which began in December, 1895. This suit was begun in March, 1897. There is no other evidence as to the actual sale of such press-wheel attachments than that contained in the stipulation referred to, though it is shown that since December, 1895, such attachments have not been advertised in catalogues issued since that date. In this condition of the evidence, the learned circuit judge held that complainant had failed to establish infringement by failure to show sales of drills including the press-wheel attachment of the fourth and fifth claims. In this we think he erred. The stipulation shows that sales of drills including the press-wheel attachment had been made at some time prior to the filing of the suit, and, although Swope's evidence shows that no sales had been made since his connection with the McSherry Company, there were on hand some 300 of the infrin-

ging parts. An injunction should go against any sale of the drill with such parts attached, and for an accounting by reason of sales heretofore made. That the press-wheel attachment infringes, we have no doubt. The only difference between the structure of the Hoyt patent, under its fourth and fifth claims, not heretofore dealt with, is that defendants have united the draft and spring-pressure rods of the covering-wheel, G, about halfway back of the hopper, H, into one part, and doubled it back on itself, and then attached the upper end thereof to the shoe spring-pressure rods, I, of the patent, in substantially the method of the patent. This is a mere change of form. The function is the same. Pressure is transmitted to the covering-wheel from the shoe spring-pressure rods through the partly-united covering-wheel pressure-rods in substantially the same way as in the method of the patent. The decree must be modified so as to find the fourth and fifth claims infringed, and in all other respects affirmed. The McSherry Manufacturing Company will pay costs of both appeals.