## HALL MAMMOTH INCUBATOR CO. v. TEABOUT.

(District Court, N. D. New York. June 5, 1913.)

1. PATENTS (§ 157*)—INFRINGEMENT—CONSTRUCTION OF CLAIMS.

　　Unless there are limitations written into the claims of a patent or imposed by the prior art or by the acceptance of a narrow claim in place of a broad one in the Patent Office, in order to secure the patent, the inventor is entitled to every form in which his invention may be copied and to a broad construction.

　　[Ed. Note.—For other cases, see Patents, Cent. Dig. §§ 229–232; Dec. Dig. § 157.*]

**2. Patents (§ 246\*)—Infringement—Omission of Elements in Combination.**

Joining two elements of a patented combination into one, or dividing one into two, the one or the two, as the case may be, doing the same work as was done before in the same way, and no more, will not avoid infringement; but when the patentee writes into his claim a specific element, especially when there is a prior art, and gives to that element a specific or special function in the combination, one who leaves such element out, and does not substitute an equivalent, is not an infringer, although the result is the same, brought about by minor changes and suitable adaptation of the remaining elements.

[Ed. Note.—For other cases, see Patents, Cent. Dig. § 387; Dec. Dig. § 246.\*]

**3. Patents (§ 246\*)—Infringement—New Combination.**

The fact that one by changing the location of one of the elements of the machine and claim of a patent and attaching it to another of the elements of the machine and claim without changing the form and function of the element to which it is attached, except to make it perform a double office or function, may and does leave out one of the elements of the patent as claimed, and still obtain the same result, does not make him an infringer, even though in all other respects his machine is a Chinese copy of the one described and claimed in the patent, but his change produces a new combination.

[Ed. Note.—For other cases, see Patents, Cent. Dig. § 387; Dec. Dig. § 246.\*]

**4. Patents (§ 246\*)—Infringement—Combination.**

Where a patentee has specifically claimed all the elements of a combination, he thereby asserts their materiality, and cannot be heard to deny it.

[Ed. Note.—For other cases, see Patents, Cent. Dig. § 387; Dec. Dig. § 246.\*]

**5. Patents (§ 328\*)—Infringement—Incubator.**

The Hall patent, No. 692,277, for an incubator, as limited by the prior art and the specific language of the claim, *held* not infringed.

In Equity. Suit by the Hall Mammoth Incubator Company against Charles Teabout. On final hearing. Decree for defendant.

Cookinham & Cookinham, of Utica, N. Y. (Edmund Wetmore, of New York City, of counsel), for complainant.

William T. Welden, of Richfield Springs, N. Y. (Henry N. Paul and Joseph C. Fraley, both of Philadelphia, Pa., of counsel), for defendant.

RAY, District Judge. The patent in suit, No. 692,277, for "incubator," was granted to Wilber P. Hall, of Pembroke, N. Y., February 4, 1902, and the claim reads as follows:

"In combination with an incubator, a heater, having a water jacket, pipes within the incubator having communication with said water jacket, the upper end of the heater having an air chamber, a throttle mounted over an aperture leading into said chamber, a stem to said throttle passing through an aperture in the upper wall of said chamber, an expansion cylinder, a float mounted therein, said expansion cylinder having communication with the water jacket, an adjustable bracket arm on the support for the expansion cylinder, a lever pivoted to the end of said bracket arm, a damper pivoted to the top of the chamber of the heater, a rod connecting said damper, with the pivoted lever, a second lever fulcrumed on a bracket or arm of said ex-

---

pansion cylinder, and having connection with the float at one end, and the stem of said throttle at a location adjacent to its other end, which rests upon the pivoted lever carried by the bracket arm, substantially as shown and described."

The defendant insists it does not have the combination of elements of this claim or equivalents therefor and therefore does not infringe; also, that the prior art limits the range of equivalents, and that complainant's patent is very narrow.

What are the elements? (1) An incubator proper; (2) a heater, having (a) a water jacket, (b) pipes within the incubator proper having communication with said water jacket, (c) the upper end of the heater having an air chamber; (3) a throttle mounted over an aperture leading into said chamber; (4) a stem to said throttle passing through an aperture in the upper wall of said chamber; (5) an expansion cylinder (some distance above the heater); (6) a float mounted in the cylinder, (a) said expansion cylinder having communication with the water jacket; (7) an adjustable bracket arm on the support for the expansion cylinder (the said cylinder being supported by an arm connected with and extending upward from the water pipe running from the heater); (8) a lever pivoted to the end of said bracket arm (element 7); (9) a damper pivoted to the top of the chamber of the heater; (10) a rod connecting said damper with the pivoted lever; (11) a second lever fulcrumed on a bracket or arm of said expansion cylinder and having (a) connection with the float at one end, and (b) connection with the stem of said throttle at a location adjacent to the other end of the lever which (c) rests upon the pivoted lever carried by the bracket arm, all substantially as shown and described.

The defendant has the first six elements above mentioned, but contends he does not have either "an adjustable bracket arm on the support for the expansion cylinder," or "a lever pivoted to the end of said bracket arm" or a "rod connecting the damper with this pivoted lever" or "a *second* lever fulcrumed on a bracket or arm of said expansion cylinder and having connection with the float at one end, and the stem of said throttle at a location adjacent to its other end *which rests upon the pivoted lever carried by the bracket arm.*" He does have a lever fulcrumed on a bracket or arm of the expansion cylinder and having connection with the float at one end and the stem of said throttle at a location adjacent to its other end, but this does not rest on any lever carried by the bracket arm.

The incubator proper has no necessary connection with this automatically operating heating apparatus. Hot water pipes run from the heating apparatus to the incubator with return pipes for the purpose of properly heating same, and, of course, maintaining uniform heat therein. This heating apparatus could be used to heat any other room equally as well. The differences in construction between complainant's apparatus made under this Hall patent and the defendant's apparatus relate entirely to the means for regulating the heat in the heater, and consequently the temperature of the water in the water jacket and the parts connected therewith. In both constructions, the heaters proper are substantially the same. There is a fire pot for the fuel, an ash pit, a draft damper at the base, and this fire box is surrounded

with a water jacket whence pipes lead to the compartments to be heated. Above the fire pit is an air chamber with a door or damper pivoted to the heater and opening to the outside air. There is, of course, a chimney with flue for the passage of smoke and heat. The throttle is an opening in the top of the fire pot, opened or closed, as the throttle proper which fits into the opening is raised or lowered. This throttle has a stem extending upward as high as the expansion cylinder or connected with a rod which does. Close the throttle opening from the fire pot into the air chamber and direct draft is obstructed, and opening the door or damper into this air chamber allows cold air to come in on top of the water jacket, and cool the water therein more or less. It is well known that water when heated expands. Attached to the hot water pipe which leads from the jacket to the compartments to be heated, and outside the heater, is a perpendicular water pipe which carries at its upper end, some distance above the heater, the expansion chamber in which is mounted the float on the water which is raised or lowered as the water in the jacket and pipes becomes hotter or cooler. This float, operated by the hot water, the real power, is the power which controls the door or damper opening into the air chamber, and also the throttle proper mounted over the aperture leading from the fire pot into said air chamber, and which aperture it is designed to close. If by suitable connecting apparatus the rise or lifting of the float in the expansion chamber closes the throttle, and opens the door or damper leading from the outer air into the air chamber, draft is checked, and the fire is more or less deadened, and as the cold air comes in contact with the water jacket the hot water therein is more or less cooled. As the water gets cooler, the float sinks, and a reverse action takes place, and the throttle is opened and the damper or door referred to closed. As already stated, the differences between complainant's structure and that of defendant lie in this connecting apparatus. As seen, the claim of the patent in suit is full of detail as to this means for coincidently operating the door or damper and the throttle. The patentee introduced into his claim as an essential element "an adjustable bracket arm on the support for the expansion cylinder." A glance at the drawings and specifications shows that the function of this bracket arm is to support "the lever pivoted to the end of said bracket arm." This lever is connected at one end with the rod or wire extending downward to and connecting with the damper or door opening from the outer air into the chamber above the fire pot, and controls such damper. The float in the expansion cylinder has an upwardly extending rod or arm connecting with the second lever at its (so called) inner end which second lever is fulcrumed on a bracket or arm of said expansion cylinder. The throttle has an upwardly extending stem or arm connecting with the other or outer end of this second lever which controls the throttle. That is, as the float rises in the expansion cylinder, the inner end of this second lever is elevated, and the outer end lowered, and this allows the throttle to close shutting off the draft of the heater. The first lever, pivoted or fulcrumed on the bracket arm, extends its inner end under the outer end of the second lever, and as the throttle drops down into place shut-

ting off draft the inner end of the first lever is pressed downward, and its outer end elevated thereby lifting on and opening the door or ·damper into the cold air chamber and this allows the inrush of cold air. When the water cools and the float descends, the reverse action takes place; that is, the outer end of the second lever is raised, thereby opening the throttle, and at the same time allowing the inner end of the first lever to rise, thereby allowing the damper or door to drop or close.

### Defendant's Structure.

What has the defendant done? As stated, he has no bracket arm on the support for the expansion cylinder and no lever pivoted to the end of any such bracket arm, and no rod connecting the damper with any lever pivoted to a bracket arm or the expansion cylinder support. He has no *second* lever *resting on a pivoted lever carried by a bracket arm* or any lever. Defendant does have a lever fulcrumed on a bracket or arm of the expansion cylinder, and having connection with the float at one end and the stem of said throttle at its other end, but neither end of this lever rests upon any pivoted lever or any pivoted lever carried by any bracket arm or any arm.

Defendant operates the throttle in this manner, viz.: As the float rises in the expansion chamber, the outer end of his lever is lowered, and the stem of the throttle thereto attached drops and the throttle is closed. Defendant has also attached a chain to this lever and to the draft damper at the foot of the heater, and hence this damper is closed at the same time as the throttle. It is, of course, opened at the same time, and when the water becomes cool or cold enough to allow the float to fall. This added chain and use made of this lever has nothing to do with this controversy.

The door or damper opening into the air chamber and pivoted to the top of the chamber of the heater is controlled and regulated coincidently with the throttle in this manner, viz., attached to the stem of the throttle, which is, as stated, attached to the outer end of the lever above described, and only a short distance above the top of the heater is a horizontal arm, and the door or damper opening into the air chamber has an arm (or lever) extending back over the top of the heater to engage with said horizontal arm on the stem of the throttle which extends over the arm of this door or damper or lever attached to such damper. When the float rises, the lever above described fulcrumed to the bracket on the expansion cylinder drops at its outer end, as stated, and by means of the stem to the throttle the throttle is closed. As this stem descends, the said horizontal arm carried by it descends also, and, pressing on the arm or lever attached to the door or damper opening into the cold air chamber, opens such damper allowing the in-pour of cold air. We have here a second lever, but it is attached to the door or damper, and is governed and operated by the movement of the first lever described, or, directly, by the arm on the stem of the throttle, which stem is operated and controlled in its movements by the said first lever connected with the float in the manner described. This lever or arm attached to the door or damper is not found in complainant's structure. In defendant's structure neither lever is pivoted

to the end of any bracket arm on the support for the expansion cylinder, as defendant has no such bracket arm. In both structures the hot water moves the float, and the float moves the levers, and the levers control, respectively, the throttle and the damper. There is a difference in the intermediate means employed and in the structure, but really no difference in result, or in the mode of operation of the heater or incubator as a whole.

Does defendant have an allowable equivalent for the "adjustable bracket arm on the support for the expansion cylinder"? In complainant's patent in suit this bracket arm carries a lever which, operated by the lever which controls the throttle and which last lever is directly connected to the float, controls the door or damper to the cold air chamber. In defendant's structure the lever which controls this door or damper is attached to such damper and is operated by the stem of the throttle, which, in turn, is operated by the lever fulcrumed to the bracket on the expansion cylinder and directly connected with the float. That is, in both structures there are two levers. In both structures one of these levers is fulcrumed on a bracket or arm of the expansion chamber with its inner end connected to the float, and its outer end connected to the upper end of the stem of the throttle, and hence the direct function of this lever in both structures is to control the throttle. So far there is identity. Defendant, dispensing with the "adjustable bracket arm on the support for the expansion cylinder," and the "lever pivoted to the end of said bracket arm" (and which lever controls the damper into the cold air chamber) and also with the rod or arm leading from the outer end of this lever to the damper, substitutes the horizontal arm attached to and on the stem of the throttle and also a lever attached directly to the damper opening into the cold air chamber, and which lever is operated or controlled indirectly by this horizontal arm, but directly by the stem of the throttle and the lever on the bracket attached to the expansion cylinder, and controlled, in turn, by the float. The location of the lever for controlling the damper is changed, and this lever, instead of being supported by "an adjustable bracket arm on the support for the expansion cylinder," is supported directly by the damper itself to which it is attached. We have a substituted lever, but do we have any substitute for the said bracket arm?

In defendant's structure the damper performs an added function. It not only controls the ingress of cold air into the cold air chamber, but it carries the lever made a part of it, and with the aid of the horizontal arm on the stem of the throttle performs the function of the adjustable bracket arm on the support for the expansion chamber of complainant's structure. This horizontal arm is indispensable, but its location and support and function are different from the function of the adjustable bracket arm. Its function is different, as it does not support anything. It moves the lever attached to the damper—applies power to it to open the damper, and on releasing the lever the weight of the damper causes the same to fall and close the opening into the cold air chamber. We do not have the same number of elements in the one structure we have in the other. Defendant says that the, or a, function of the outer end of the lever (of the patent in suit) "fulcrumed

on a bracket or arm of said expansion cylinder" (and which controls the throttle), is specifically mentioned in the claim, and that the lever attached to the damper in defendant's structure performs no such or similar function. The language referred to is:

"A second lever fulcrumed on a bracket arm of said expansion cylinder, and having connection with the float at one end and the stem of said throttle at a location adjacent to its other end which (end) rests upon the pivoted lever carried by the bracket arm."

The object of having this outer end of this (second) lever of the patent in suit rest upon the inner end of the pivoted lever carried by the bracket arm is to depress that inner end and elevate its outer end to which is attached the rod leading to and connected with the damper opening into the cold air chamber and so raise or open the damper. Elevating the outer end of such lever opens the damper in complainant's structure while depressing the end of the lever directly attached to the damper in defendant's structure opens such damper.

[1, 2] The complainant, instead of taking the claim of the patent element by element as specified in the claim, divides these elements into three groups (leaving out the incubator proper; that is, the heated chamber or chambers in which the eggs are placed), viz.: (1) heater with fire chamber, jacket, air chamber, throttle and damper; (2) expansion cylinder, float therein, and a lever connected with the float at one end and with the throttle by means of the rod or stem at the other; (3) the parts for actuating the cold air damper, and which consists of the lever mounted on the bracket arm for its support and the rod or arm extending from this lever to the damper. Complainant insists that this third group is to be treated as one element made up of parts, and that defendant has changed the location and form of those parts, viz., by substituting the stem of the throttle to carry a lateral arm for controlling the lever attached to the damper, and substituting a lever directly attached to the damper and controlling this lever by the said lateral arm, and the movement of the stem of or rod attached to the throttle. If we can properly segregate the elements of this claim into groups, each group accomplishing a certain result and say there are only three elements in the claim (outside the incubator box proper), and that defendant has three groups, each performing the same function as does the corresponding group in complainant's device, then there is substantial identity and infringement is made out; but, if we must find in defendant's device element for element as written into the claim of the patent all the elements or an equivalent therefor, then it is difficult to find infringement. It is, of course, settled patent law that changing form and proportions and even location of parts will not avoid infringement, if the functions remain the same, and hence the mode of operation and results remain substantially the same. Unless there are limitations written into the claim or imposed by the prior art, or by the acceptance of a narrow claim in place of a broad one, in the Patent Office, in order to secure the patent, the inventor is entitled to every form in which his invention may be copied and to a broad construction. Winans v. Denmead, 15 How. 330, 342, 14 L. Ed. 717. And joining two elements into one, or dividing one into two,

the one or the two, as the case may be, doing the same work as was done before in the same way and no more, will not avoid infringement. Nathan v. Howard, 143 Fed. 889, 75 C. C. A. 97. This is not eliminating one of the elements of the patent, but a mere change of form and construction. So descriptive words in a claim may be treated as surplusage and immaterial. But when a patentee writes into his claim a specific element, especially when, as here, we have a prior art, and gives to that element a specific or special function in the combination, he who discovers that one of those elements may be left out and who leaves it out and does not substitute an equivalent is not an infringer, although the result is the same, brought about by minor changes and suitable adaptation of the remaining elements. Here the defendant has left out the "lever pivoted to the end of said bracket arm" and also the "adjustable bracket arm on the support for the expansion cylinder," and he has used the damper to support and carry the lever, the location of which is changed, carried by the bracket arm of complainant's device. To control this damper, the defendant has added the lateral arm to the stem of the throttle, a function performed by the outer end of the other lever in complainant's device. The result is that the movement of the lever controlling the damper is controlled, indirectly, by the movement of the lever ("second lever" of the patent) fulcrumed on a bracket or arm of the expansion cylinder.

It was old in the prior art to raise and lower the throttle and damper, or to raise the one and lower the other coincidently by means of levers and lever attachments connected with a float operated by hot water or steam or hot air; the purpose being to regulate the temperature. Hall did not broadly claim "means" for doing this. If he had, his application must necessarily have been rejected on the prior art, unless it was patentable invention to substitute a coal furnace or heater for one having a lamp for heating the water in the boiler or water receptacle.

In the Eddy patent for "incubator," dated January 11, 1887, No. 355,684, we have heat maintained in the incubator proper by means of hot water pipes connected with a hot water tank in the upper part of the incubator which is connected with a boiler, outside the incubator proper, and which boiler, as shown and particularly described, is heated by a suitable lamp, but the patent says:

"Instead of the boiler C any other suitable boiler may be employed if preferred."

It is evident that a coal heater, furnace, or oil stove could be substituted without departing at all from the invention. In his heater Eddy has a flue, h, which when closed by a damper, b, opening into the outer air, forces the heated air into a chamber, l, in contact with the walls of the boiler thereby heating the water. When damper b is opened in a manner to be described, the heat passes off, and the water rapidly cools. When closed, the water in the boiler is heated, and passes through an induction pipe into a tank B, which has an eduction pipe D leading back to boiler C. A vertical ventilating tube extends from the interior of the incubator through the tank to the open air, and this tube is provided with a centrally pivoted damper y. Closed, this

·damper confines the heat in the interior of the incubator, but, open, it allows the heat to escape, there being a tube at the bottom for the ingress of fresh or cold air. To make this incubator, including the heater, self-regulating, means are provided for opening dampers *b* and *y* ·coincidently when the heat became excessive. As in the patent in suit, the heat itself, by means of floats in contact with and operated by the hot water and connected to one of the levers and by means of two levers, the end of one resting upon the end of the other, thereby controlling it, and which levers are attached respectively to dampers *b* and *y*, regulates and controls such dampers and consequently the heat of. the water, and also the heat of the air in the incubator. Eddy has twin tubes, *H*; that is, "an expansion cylinder and a float mounted thereon." Each tube has a float, *J*. These floats are provided with a ·downwardly opening air chamber, and are partially submerged in the water in the tank, and are connected by rods to one of the levers, lever *O*, which has an arm for. the purpose. This lever is supported by and pivoted to a post on the incubator and connected at one end, its inner ·end, by a rod, to damper *y* in the ventilating shaft. The outer end of this lever rests on the inner end of lever *P* which is pivoted on another post, or support. The outer end of lever *P* is connected by a· rod to damper *b* in the heater. The operation is very simple. When the water is hot, it expands, and not only tends to raise the floats, but it heats the air in the downwardly opening air chambers of such floats, and so they are forced upwardly by heat. This lifts the inner end of lever *O* and opens damper *y* and at the same time depresses the outer end of lever *O* which pressing down on the inner end of lever *P* causes its outer end to rise and open the damper *b*. When the water is cool enough, the reverse action follows. Damper *b* is the "throttle" of Hall and damper *y* is Hall's damper opening into the air chamber above the fire pot. Possibly Hall improved somewhat on the means for regulating dampers by his specifically described and claimed means; but, in view of this prior art, I do not see that defendant infringes the Hall patent by using the means he does for that purpose. Hall with great minuteness not only specifically described in his claim, but claimed a certain construction containing certain elements, which, as specifically described and claimed, was new with Hall and to that extent there was novelty; but the defendant has not copied that construction unless he has substituted equivalents. Defendant's structure (referring to these means) is also an advance on and a departure from the prior art, but it does not embody the complainant's specific structure as a whole.

The patent to McAvoy, No. 93,104, issued July 27, 1869, for "heat-regulator for hot water apparatus," the object of which invention is to "produce an automatic heat regulator for hot water and other heating apparatus," which may be attached to almost any furnace or heater having a water reservoir, provides for a cylinder or chamber surrounded by the water or steam of the apparatus so the heat thereof is imparted to the chamber. Into the chamber extend a pair of tubes one for the ingress of water, and the other extending further down is provided at its upper end with a chamber (expansion chamber) containing

a piston or float "on the bottom of which the fluid is caused to press by the formation of steam and the rarefaction or expansion of the air within the chamber by unusual heat." Says the patent:

"The stem of the piston or float is connected, through suitable media, to the draught and fuel doors, or to a damper or dampers in the flues of the furnace which it thus serves automatically to operate as required."

The piston, or float, is, of course, forced upward by excessive heat, and its stem, attached to a lever *G*, which is fulcrumed to a standard supporting it, will elevate one end of such lever and, of course, depress the other end. A chain is attached one to each end of this lever, and these chains are attached, respectively, to the draft door (for admitting air to create a draft) and the furnace door for the admission of fuel and cold air, one or both. In this device of McAvoy he has the draft door normally open, but, when the heat becomes excessive and the float is elevated, the end of the arm of the lever attached to the chain connected to the draft door is depressed and the draft door closed, thus checking the draft and heat. As the other end of this lever is attached by a chain to the furnace door, if the closing of the draft door does not sufficiently subdue the heat, the continued rise of the float will further elevate this end of the lever and open the furnace door allowing cold air to come in on top of the burning fuel, still further checking the draft.

Other patents in the prior art show means for controlling dampers, doors, and the heat in heaters, etc., but it is not necessary to describe them. There is nothing new or novel in the idea of a "throttle" above the fuel chamber to control or regulate the draft or aid in so doing and thus aid in controlling the heat.

But, aside from all this, the real controversy here, as I look at it, is over the damper and throttle regulating mechanism, and over that part of it which regulates the damper or door opening into the air chamber and which is pivoted to the top of said chamber of the heater. This Hall claim specifically calls for "an adjustable bracket arm on the support for the expansion cylinder" and "a lever pivoted to the end of said bracket arm" and "a rod connecting said damper" (the door or damper opening into this cold air chamber) with the pivoted lever (the lever pivoted to the end of the bracket arm and which lever is actuated by the outer end of the other lever which is pivoted to a bracket on the expanding cylinder).

As we have seen, defendant's structure has no such bracket arm, the function of which is to support the lever which operates the damper above mentioned. In defendant's structure the lever which operates that damper is attached directly to the damper and forms a part of same, and is, of course, supported thereby, and hence a bracket arm adjustable on the support for the expansion cylinder is unnecessary. We have a lever with which to operate this damper, but at a different place and differently supported. The rod mentioned in the claim extending from the damper to the lever pivoted to the bracket arm is also dispensed with. But this necessitates the substitution of the horizontal adjustable arm on the remaining rod which extends from

the lever pivoted to the bracket on the expansion cylinder to the throttle. In defendant's structure one of the rods of the Hall patent, with a horizontal arm added thereto, does the work of the two rods in the Hall patent. However, we cannot escape the fact that a bracket arm to support a lever pivoted thereon to operate the damper is wholly eliminated in defendant's structure, and that the lever for the damper being attached thereto directly is supported thereby. By writing an element into a claim the patentee necessarily alleges its materiality and claims it as such. Not so of mere descriptive words which, as stated, may be disregarded. It is also true that a patentee may claim a thing, made up of parts, as an element of his claim in a combination, and describe the construction of that thing or element without so limiting himself that another may copy his combination in every respect other than the detailed construction of that element as described in the patent and escape infringement.

Hall's idea of means was some connecting apparatus which operated on by the rising float in the expansion chamber would close the throttle by permitting it to drop down into the opening at the top of the fuel chamber, thereby shutting off draft, and at the same time open the damper into the air chamber above the fuel chamber, thereby permitting the inflow of cold air. His idea of means to accomplish this was embodied in the apparatus described, viz., two levers, one connected to the float by its stem at one end and to the throttle near its other end by means of a connecting rod, and the other lever, connected to the float by means of being directly in contact with and acted upon by the lever first mentioned at one end and connected to the damper by means of another rod at the other end. To obtain proper action on the throttle and damper at the same time by lifting the float—that is, lower the one and raise the other—it was necessary to lower the end of the lever to which the throttle is attached. This was simple as the mere rise of the float accomplished this result. But there must be a lifting action on the damper at the same time by the rise of the float, and hence the necessity for the other lever. To lift the damper, it was necessary to connect it to the outer end of this other lever, which end could be elevated; and, as Hall so elevated it by pressing down its inner end by means of the depression of the outer end of the first lever here mentioned connected to the throttle, it became necessary on account of the location of this second lever, the lever for the damper, to have a support for such lever on which it could be pivoted. Hall then provided a specific means for this, viz., "the adjustable bracket arm on the support for the expansion cylinder," and also provided "a rod connecting said damper with the pivoted lever"; that is, the lever pivoted on the said bracket arm. In doing this Hall was not merely describing an element of his claim the function of which element is to lift the damper, but was naming and claiming specifically the elements of his apparatus for lifting such damper. These and all these he claimed with their equivalents. True it is that here we have an apparatus for lifting the damper, but it is made up of elements, each of which is described and claimed. In this combination is a lever operating the damper which is supported and fulcrumed on the bracket

arm provided for the purpose, which, in turn, is adjustably mounted on the support for the expansion cylinder, and which lever is in contact with and controlled by another lever at one end and attached by a rod to the damper at the other end. This lever in this combination is the mechanical equivalent of a lever directly connected to and forming a part of such damper, and hence supported thereby and fulcrumed thereon, and not connected to the other parts mentioned otherwise than by being pressed upon and actuated by the horizontal arm adjustably attached to the rod leading to the throttle and actuated in the manner described so far as lifting the damper is concerned. In both the power is from the same source, the float; the damper is opened by the lifting thereof; the damper is lifted by the direct depression of the outer end of its lever in defendant's device, and by the elevation of the outer end of its lever in complainant's device, but in both devices it is the rise of the inner, or float end, of the lever supported on the expansion cylinder, that actuates this damper lever. But the fact remains that the connections and means intermediate the outer end of the lever pivoted on the expansion chamber and the damper are wholly different.

The difficulty I meet with in finding infringement by defendant is that:

"In making his claim the inventor is at liberty to choose his own form of expression; and, while the courts may construe the same in view of the specifications and the state of the art, they may not add to or detract from the claim. And it is equally true that, as the inventor is required to enumerate the elements of his claim, no one is an infringer of a combination claim unless he uses all the elements thereof." Cimiotti Unhairing Co. v. American Fur Refining Co., 198 U. S. 399, 410, 25 Sup. Ct. 697, 702 (49 L. Ed. 1100), and cases there cited.

And I find difficulty in holding that defendant has in his combination all the recited and specified elements of the Hall claim or equivalents therefor. Defendant has a structure in which at least one of those elements of the Hall claim is wholly unnecessary, and is therefore eliminated without the substitution of an equivalent, useless using the damper itself to support its lever is the substitution of an equivalent. The lateral arm of defendant adjusted to the rod connected to the stem of the throttle may properly be regarded as the equivalent of the rod leading from lever to damper in complainant's device. It is the element which directly or immediately controls the movement of the damper. When the lateral arm descends with the rod attached to the throttle (which action closes the throttle), it presses on the outer end of the lever of the damper and opens it, and when that rod ascends, and thereby opens the throttle, this cold air damper is again closed. But when this damper itself in defendant's device is made to perform the double function of opening and closing the passage into the cold air chamber, and also supporting the lever which controls such damper, a function performed in the Hall patent by the bracket arm adjustably mounted on the support for the expansion chamber, have we substituted an equivalent for such bracket arm? The defendant has not changed the form or construction of this damper, except by attaching the lever thereto directly as an integral part thereof. Hall connects his damper lever to the damper by means of a rod.

This may be treated as an immaterial variation, but, when we come to eliminate Hall's bracket arm and use the damper, one of the essential elements of both structures, to perform its functions we have something more than mere change of form or location of parts. We have not changed the main function of the damper or its mode of operation, but we have changed the means for operating it and the mode of operating it, and have made it perform an added function, that of supporting the lever by which it is opened and closed.

It is evident that the patentee, Hall, did not really intend to restrict himself in his claim as narrowly as he did. He says:

"I employ a throttle adapted to be actuated by the expansion of a liquid in a chamber connected with the furnace, and, as this throttle is actuated, its lever actuates means that control the admission of cold air to the furnace, thus automatically maintaining a practically uniform temperature in all parts of the machine."

It is evident from this that his idea of means was to actuate the lever, etc., controlling the damper through the lever controlling the throttle, and which lever is actuated by the rise and fall of the float. This idea was executed by the means described and claimed, and is found in defendant's device executed by the means which he adopted. Hall also says:

"In the present instance I have shown one form of mechanism for this purpose; but it is evident that other forms of mechanism may be provided, and yet accomplish the same purpose. * * * From the above it will be seen that I have devised a simple, cheap, yet practical and efficient incubator, and while the structural embodiment of my invention *as herein disclosed* is what I *at the present time* consider the preferable, it is evident that changes, variations and modifications may be resorted to without departing from the spirit of the invention or sacrificing any of its advantages, and I, therefore, do not wish to restrict myself *to the details of construction herein illustrated and described* (he does not say claimed), but *reserve the right* to make such changes, variations and modifications as come properly within the scope of the protection prayed."

This, of course, shows Hall's appreciation of the fact that other forms of mechanism for lifting and dropping the damper—that is, opening and closing it—were possible, and this should have cautioned him not to be so specific in his claim as to limit himself to a construction with the specific elements of means there detailed. Many cases are found where a patentee has unnecessarily limited himself in his claims. The complainant's expert, Mr. Wilhelm, contends that an equivalent for the "adjustable bracket arm" aside from its location as stated in the claim is found in defendant's structure. On cross-examination he was asked to point out (cross-question 23) the equivalent for the bracket arm of the Hall patent. He answered among other things referring to the bracket arm:

"As I look at it, it is simply a pivoted support for the damper lever 24. In defendant's machine there is no such bracket arm fastened to the pipe which connects with the expansion lever for pivotally supporting the damper lever, but, instead of that, the damper lever is supported on a pivoted support 17 on the top of the air chamber, and this support performs the function for the damper lever in defendant's machine which is performed by the bracket arm 26 in the patent in suit."

To make this clear he was asked (cross-question 24):

"I asked you to point out by reference to numerals the part or parts which in your opinion constitute the equivalent of this adjustable bracket arm. Am I to understand that you point out the part *17* as being such equivalent? A. That is my view."

The part *17* pointed out by the witness are the ears or projections on the damper, which is neither more nor less than a door which opens by lifting the lower end, and which is hinged or pivoted by means of projecting ears on the upper end of the door or damper and corresponding ears on the furnace, all of which ears have corresponding openings or holes through which is passed one or two rods, one for each set of ears it may be. The door or damper is fulcrumed on this rod or these rods on which it turns and by which it is held in place. This is exactly the construction of the Hall furnace, and exactly the attachment of his door or damper to his furnace. In both the door or damper is pivotally attached to the top edge of the furnace or heater. When the defendant extended his arm or lever from this door made integral with it, and pressed on the outer end of such lever, the door pivotally mounted on the furnace by means of the ears and rod, or rods was lifted at its lower end and opened. When Hall attached his wire chain or rod to the lower portion of this door mounted and pivoted on the furnace in the same way and at the same place and pulled up by means of his lever and rod, he opened the door in precisely the same way. Hall has, and his claim calls, in addition for the bracket arm on which to pivotally mount the lever for operating this door or damper, and as stated this was a necessary element of his claim with the lever located as it is in his patent and claim. When defendant eliminates this bracket arm he substitutes nothing in its place. He substitutes no equivalent, but uses the door or damper pivotally mounted on the upper edge of the heater or furnace as the support for the damper lever. By changing the location of his damper lever and attaching it to the damper itself he simply eliminates the bracket arm. On this subject Mr. A. S. Browne, defendant's expert, testifies:

"Moreover, these ears *17* are identical in location and function with the corresponding ears *17* of the Hall patent. Accordingly, if it is to be accepted (as it cannot be) that these ears *17* perform the same office as the adjustable bracket *26* of Hall, the defendant has discovered that the bracket *26* is a wholly unnecessary feature, because he leaves it out altogether, and does its work through the already existing ears *17*. Therefore, if Mr. Wilhelm's opinion is correct that defendant's ears *17* do the work of the Hall bracket arm *26*, defendant has dispensed altogether with the bracket arm *26* and has not substituted anything whatever for it, because he gets the result (according to Mr. Wilhelm) by utilizing the existing ears *17* and without adding anything thereto. The omission of a part altogether without putting anything else in its place is not equivalence. In order that two devices may be equivalents, it is not only necessary that they should perform substantially the same results, but also that they should do it in substantially the same way. If it be assumed that the same eventual result is accomplished by Hall, and by defendant, that result is not accomplished in the same way. On the contrary, defendant dispenses altogether with Hall's bracket arm *26* adjustably mounted on the support for the expansion tank; and he gets the result by different mechanism, and differently arranged as compared with the remaining mechanism recited in the Hall claim."

He who copies the patented machine of a patentee made strictly according to the claim of his patent, except that he leaves out one of the elements of such machine described and claimed in the claim of the patent without making any substitution, is not an infringer of such patent. Dunbar v. Meyers, 94 U. S. 187, 201, 202, 24 L. Ed. 34; Wright v. Yuengling, 155 U. S. 47, 52, 15 Sup. Ct. 1, 3, 39 L. Ed. 64; Loraine Development Co. v. General Elec. Co. (C. C. A.) 202 Fed. 215; Walker on Patents, § 349.

[3] And the fact that by changing the location of one of the elements of the machine and claim of the patent, and attaching it to another of the elements of the machine and claim, without changing the form and function of the element to which attached, except to make it perform a double office or function, such person may and does leave out one of the elements of the patent as claimed, and still obtain the same result, does not make him an infringer, even if in all other respects his machine or structure is a Chinese copy of the one described and claimed in the patent. It must be and is a different invention— not an improvement on the other merely.

In Walker on Patents (4th Ed.) § 349, it is said:

"And infringement is not averted by uniting two elements of a machine or manufacture into one integral part, if the united part performs the same function in substantially the same way as did the separate parts before the union."

In section 352 he says:

"One thing to be the equivalent of another must perform the same functions as that other. If it performs the same function, the fact that it also performs another function is immaterial to any question of infringement."

But this does not mean that if a claimed element of a patented structure is discarded by the alleged infringer and nothing is substituted therefor, but the alleged wrongdoer changes the location of an element before supported by the discarded element and which discarded element was absolutely essential to the working of the element whose location is changed, and attaches the element, the location of which is changed to another claimed and essential element of the device alleged to be infringed making the latter element perform a double function, that there is infringement. What the above statement means, and what the cases hold, is that if an element is substituted, and the substituted element is an equivalent for the one discarded and performs the function of such discarded element, it is immaterial, so far as infringement is concerned, that it also performs an added function or some further function in the infringing machine. See Masseth v. Palm (C. C.) 51 Fed. 824; Norton v. California, etc. (C. C.) 45 Fed. 637; Comptograph Co. v. Mechanical Accountant Co., 145 Fed. 331, 337, 76 C. C. A. 205.

Mr. Browne, defendant's expert, claims that the purposes accomplished by the two devices are not the same, in that the arrangement of the levers in Hall's device at a distance above the top of the furnace or heater was to accomplish a definite purpose, viz., remove them from interference with the introduction of coal into the fuel chamber which is done by removing a cover on the top of this cold air chamber and

lifting out and turning to one side the throttle stopper, and then pouring in the fuel. In both machines or structures this operation of feeding fuel is the same, as the water jacket entirely surrounds the fuel chamber, and it is plain that, if Hall's damper lever and connecting rod were lowered so as to support the lever on the top of the heater, they would be in the way of and a hindrance to the feeding of the fuel chamber. In this respect Hall's device is superior to that of the defendant, whose damper lever more or less interferes with the process of feeding. This, however, has nothing to do with the operation of the incubator proper, or the operation of the heater when fuel is in, or with the ultimate results attained. Hall says nothing as to his reason for placing his damper lever where he did, but this is immaterial; for, if his location of parts be an advantage in operating the heater, he is entitled to the benefit of all the results attained in convenience and ease of operation by his construction whether mentioned by him or not.

[4] Hall elected to locate his levers and connecting rods, etc., where and as he did, and to claim specifically all the several parts, and cannot ask the court to modify or rewrite his claim by ignoring any claimed element of his combination. He asserted their materiality by claiming them, and cannot be heard to deny it. Fay v. Cordesman, 109 U. S. 408, 3 Sup. Ct. 236, 27 L. Ed. 979.

It should be added that when an alleged infringer copies the device of the patent, leaving out some minor element of construction, and making some other element perform its function in addition to its own by changing its construction for that purpose, we have a substitute for such discarded element, and it is immaterial that the two elements are united in one, provided always that the two structures operate in substantially the same way, and produce the same result. In such a case we have an equivalent for both elements, so changing the one retained in its changed form as to unite two elements into one and making the united elements perform both functions. We have something similar to this in McSherry Mfg. Co. v. Dowagiac Mfg. Co., 101 Fed. 716, 720, 41 C. C. A. 627, although in that case there was both an actual substitution of some new parts for the discarded "clamping plates" and a change of construction of one of the retained parts.

[5] I am reluctantly forced to the conclusion, in view of the language of the claim, that defendant has a combination which does not infringe the patent in suit.

The bill will be dismissed, with costs.